```
 1              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF NORTH CAROLINA
 2
    UNITED STATES OF AMERICA        ) Greensboro, North Carolina
 3                                   ) May 1, 2024
         vs.                         ) 10:40 a.m.
 4                                   )
    MARIAN HUDAK,                    )
 5                                   ) Case No. 1:23CR231
         Defendant.                  )
 6   _____)

 7                     TRANSCRIPT OF SENTENCING
 8          BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
                    UNITED STATES DISTRICT JUDGE
 9

10   APPEARANCES:

11

     For the Government:   JOANNA G. MCFADDEN
12                         ASHLEY E. WAID
                           OFFICE OF THE U.S. ATTORNEY
13                         101 S. EDGEWORTH STREET, 4TH FLOOR
                           GREENSBORO, NORTH CAROLINA 27401
14
                           DANIEL GRUNERT
15                         DOJ-CRT
                           950 PENNSYLVANIA AVE NW
16                         WASHINGTON, DC  20530

17   For the Defendant:    EUGENE E. LESTER, III
                           SHARPLESS & STAVOLA, P.A.
18                         P.O. BOX 22106
                           GREENSBORO, NORTH CAROLINA 27420
19

20

21

22   Court Reporter:    Joseph B. Armstrong, FCRR
                        324 W. Market, Room 101
23                      Greensboro, NC  27401

24           Proceedings reported by stenotype reporter.
         Transcript produced by Computer-Aided Transcription.
25
```

Sentencing - May 1, 2024

```
 1                        I N D E X

 2   WITNESSES FOR THE DEFENDANT:                        PAGE

 3   DAWN GRANEY
         Direct Examination By Mr. Lester                 16
 4       Cross-Examination By Ms. McFadden                27

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sentencing - May 1, 2024

```
10:32:00    1                    PROCEEDINGS
12:00:59    2            (At 10:40 a.m., proceedings commenced.)
10:40:48    3            (Defendant not present.)
10:40:48    4        THE COURT:  All right.  Ms. McFadden, you may
10:40:49    5  proceed.
10:40:50    6        MS. McFADDEN:  Your Honor, I believe we're missing
10:40:51    7  our defendant right now.
10:40:55    8        THE COURT:  Oh, then let's not get moving yet.
10:41:48    9            (At 10:41 a.m., defendant enters the courtroom.)
10:42:00   10        THE COURT:  All right.
10:42:01   11        MS. McFADDEN:  Your Honor, the next matter before the
10:42:02   12  Court is United States versus Marian Hudak.  That's Docket
10:42:04   13  No. 1:23CR231-1.  Mr. Hudak is present.  He's represented by
10:42:10   14  Mr. Lester.  Probation is present as well, and the matter has
10:42:14   15  been calendared for sentencing.
10:42:15   16        THE COURT:  All right.  Let me get the Slovak
10:42:25   17  interpreter sworn.  Good morning.  Welcome back.
10:42:29   18            (Interpreter sworn by the clerk.)
10:42:52   19        THE INTERPRETER:  Your Honor, Your Honor, if I may.
10:42:52   20  Mr. Hudak advised me he would like to listen in himself.  He
10:42:57   21  does not require my interpretation, and if he has any
10:43:00   22  questions, he will consult with me.
10:43:01   23        THE COURT:  All right.  Mr. Hudak, I think that's
10:43:03   24  what we ended up doing during the trial, that you understand
10:43:06   25  enough English to follow along and speak on your own behalf,
```

| | | |
|---|---|---|
| 10:43:12 | 1 | but we have the interpreter here and available to |
| 10:43:18 | 2 | simultaneously interpret or for you to use if something comes |
| 10:43:20 | 3 | up.  Do you understand all that? |
| 10:43:22 | 4 | **THE DEFENDANT:**  Yes, I do. |
| 10:43:24 | 5 | **THE COURT:**  And I understand that it is your desire |
| 10:43:26 | 6 | to not use the interpreter unless something is said that you |
| 10:43:31 | 7 | don't understand, in which case, you will check with the |
| 10:43:34 | 8 | interpreter.  And if something comes up and you need that, you |
| 10:43:39 | 9 | can raise your hand, and we can stop until you get squared |
| 10:43:43 | 10 | away.  Do you understand that? |
| 10:43:45 | 11 | **THE DEFENDANT:**  Okay. |
| 10:43:46 | 12 | **THE COURT:**  And do you agree to that? |
| 10:43:47 | 13 | **THE DEFENDANT:**  Yes. |
| 10:43:49 | 14 | **THE COURT:**  All right.  You may have a seat.  All |
| 10:43:51 | 15 | right.  Mr. Lester, a presentence report has been prepared. |
| 10:43:56 | 16 | Have you reviewed that with Mr. Hudak? |
| 10:43:58 | 17 | **MR. LESTER:**  Yes, we have. |
| 10:43:58 | 18 | **THE COURT:**  And are there any objections remaining? |
| 10:44:00 | 19 | **MR. LESTER:**  The objection to the enhancement for |
| 10:44:04 | 20 | obstruction of justice. |
| 10:44:08 | 21 | **THE COURT:**  And in terms of the financial condition? |
| 10:44:10 | 22 | **MR. LESTER:**  Yes, Your Honor. |
| 10:44:15 | 23 | **THE COURT:**  The assets, Mr. Hudak and his wife are |
| 10:44:17 | 24 | currently separated, but I don't think they're divorced. |
| 10:44:20 | 25 | **MR. LESTER:**  That's right. |

| 10:44:20 | 1 | **THE COURT:** But in terms of the assets, it's your |
| 10:44:44 | 2 | contention that these are marital property, which is a |
| 10:44:44 | 3 | complicated analysis, but I see the point. Government, I |
| 10:44:44 | 4 | think, objected to that. Let me see, what did the Government |
| 10:44:44 | 5 | say? |
| 10:44:46 | 6 | **MS. McFADDEN:** Your Honor, essentially, the substance |
| 10:44:48 | 7 | of our objection was just that the entirety of the assets that |
| 10:44:51 | 8 | are identified in the PSR should be ones that the Court can |
| 10:44:55 | 9 | take into account when determining what fine is appropriate. |
| 10:44:59 | 10 | **THE COURT:** Okay. So, maybe I'm wrong about this. |
| 10:45:12 | 11 | I'm inclined to approach it this way. I think I can impose a |
| 10:45:22 | 12 | fine whether the defendant has assets or not. The assets only |
| 10:45:25 | 13 | go to whether or not -- what payments a defendant might be |
| 10:45:28 | 14 | able to make to discharge that obligation while on supervision. |
| 10:45:33 | 15 | Certainly, in many cases, assets are a major factor because |
| 10:45:37 | 16 | there may be some relationship to the acquisition of wealth as |
| 10:45:49 | 17 | a result of participation in criminal activity and cost and |
| 10:45:54 | 18 | other things. |
| 10:45:55 | 19 | But I think I agree with the United States with one |
| 10:45:58 | 20 | caveat, and I do think it is fair to take into consideration, |
| 10:46:03 | 21 | even if not specifically identified at this point, that |
| 10:46:06 | 22 | Mr. Hudak and his wife -- I think -- was it 2021? When did |
| 10:46:11 | 23 | they split up? |
| 10:46:43 | 24 | Well, according to the mental health thing, in |
| 10:46:46 | 25 | December 2021, Mr. Hudak reported that he was separating from |

Sentencing - May 1, 2024

10:46:51  1  his wife, and his then 19-year-old daughter was living with

10:46:54  2  him.  So if you assume December '21 is the separation, I do

10:47:02  3  think the wife has a marital interest in the property because

10:47:03  4  all those properties were acquired, it appears, during the --

10:47:08  5  while they were married.

10:47:10  6      And so, I will take into consideration the value of

10:47:12  7  all the assets, but I also will take into consideration, as may

10:47:16  8  be necessary, the fact that it appears, I'm going to say

10:47:25  9  reasonably likely, that his wife does have a marital claim to

10:47:28  10  those assets should they proceed with a divorce.

10:47:31  11      Okay.  Do you want to be heard further on obstruction

10:47:33  12  at this point?

10:47:34  13      **MR. LESTER:**  No objection to Your Honor's proceeding

10:47:37  14  in that manner with respect to the fine.

10:47:43  15      I would just, in response to the Court's inquiry,

10:47:45  16  paragraph 78 of the PSR says that on or about June 6, 2021,

10:48:00  17  Defendant has resided at Red Bird Circle with his daughter.

10:48:03  18      My understanding is that their physical separation,

10:48:03  19  for sure, began when he moved out of the marital home into this

10:48:07  20  other home.

10:48:09  21      **THE COURT:**  All right.

10:48:09  22      **MR. LESTER:**  With respect to this obstruction of

10:48:10  23  justice, Your Honor, I've made a -- put a pleading forth on

10:48:22  24  that.  I'm sure the Court has read it.

10:48:26  25      **THE COURT:**  I have.

| | | |
|---|---|---|
| 10:48:26 | 1 | **MR. LESTER:** I think that there are reasons to -- for |
| 10:48:27 | 2 | the Court to consider that the testimony in this case where |
| 10:48:38 | 3 | there is a subjective determination of proximate cause, the |
| 10:48:41 | 4 | gravamen of the complaint was that these -- that these |
| 10:48:44 | 5 | incidents -- the offense conduct were motivated and occurred |
| 10:48:51 | 6 | because of a racial animus. And the Government's argument was |
| 10:48:58 | 7 | that that was sort of a subjective analysis, that they needed |
| 10:49:05 | 8 | to introduce the relics and other evidence, other acts that |
| 10:49:12 | 9 | would suggest that was his mental state. And I think where |
| 10:49:16 | 10 | you're talking about the gravamen of the case being his mental |
| 10:49:20 | 11 | state, you know, he was never examined specifically as to |
| 10:49:22 | 12 | whether, you know, he had racial animus in his heart. He was |
| 10:49:24 | 13 | examined on other questions, none of which I think were |
| 10:49:29 | 14 | materially in dispute. |
| 10:49:31 | 15 | You know, he admitted that he was in an incident with |
| 10:49:36 | 16 | Justin Duarte. He was in an incident with Justin Smith and |
| 10:49:41 | 17 | those things happened. And so, in terms of the materiality, I |
| 10:49:45 | 18 | think that's lacking here when it comes to his testimony and |
| 10:49:48 | 19 | obstruction enhancement. |
| 10:49:50 | 20 | **THE COURT:** All right. Ms. McFadden, it's been -- |
| 10:49:52 | 21 | the issue has been pretty thoroughly addressed, but I'll hear |
| 10:49:55 | 22 | from you further. |
| 10:49:57 | 23 | **MS. McFADDEN:** Your Honor, yes. This is all from my |
| 10:49:59 | 24 | position paper, so I can just hit the highlights here. |
| 10:50:02 | 25 | You know, obviously, there's three prongs to this |

Sentencing - May 1, 2024

10:50:04  1  analysis.  It's that the defendant gave false testimony, it

10:50:07  2  concerned a material matter with a willful intent to deceive.

10:50:15  3  I've detailed in my position paper, in footnotes 2 through 7, a

10:50:20  4  series of assertions by the defendant which the jury rejected

10:50:23  5  in delivering its verdict.

10:50:25  6        But, specifically, he denied under oath that he

10:50:29  7  punched Justin Duarte.  He denied that he knew Justin Smith was

10:50:33  8  black when he began to chase him back to his apartment complex.

10:50:37  9  He denied displaying the Nazi flag after he received it from

10:50:40  10  Larry at the gas station.  And he denied ever using the N-word

10:50:45  11  except when someone first called him the N-word.  The citations

10:50:48  12  are in my position paper to the specific aspects of the

10:50:49  13  transcript that reflect them.

10:50:51  14        These were all material falsehoods.  With Justin

10:50:58  15  Duarte, whether he punched him related to the issue of serious

10:51:01  16  bodily injury, which the jury found, and with the remainder of

10:51:05  17  the assertions, they related to whether he harbored racial

10:51:08  18  animus towards black people, which bore directly on whether he

10:51:11  19  chased Justin Smith home because Justin Smith was black.  And

10:51:15  20  they were false because of the ways in which they were either

10:51:18  21  rejected by the jury or contradicted by direct evidence.

10:51:21  22        For instance, as to the Nazi flag, his probation

10:51:24  23  officer testified that he was in the home, that he saw it

10:51:27  24  hanging up on the bedroom wall, he took a picture of it.  The

10:51:31  25  jury saw that.  These were not mistakes of memory.  I would

| | | |
|---|---|---|
| 10:51:37 | 1 | submit they were given with a willful intent to deceive to |
| 10:51:40 | 2 | tailor the testimony to what, you know, had been |
| 10:51:40 | 3 | incontrovertible in terms of video recordings and try to pick |
| 10:51:40 | 4 | around the edges at things that had not been to convince the |
| 10:51:44 | 5 | jury that the actions that he took were not based on the |
| 10:51:46 | 6 | reasons that the Government had charged that he had. |
| 10:51:48 | 7 | I think the Court can make findings on any one of |
| 10:51:55 | 8 | these falsehoods that are identified in footnotes 2 through 7, |
| 10:52:01 | 9 | and I submit that they more than meet the test that the Fourth |
| 10:52:02 | 10 | Circuit has required for this enhancement. |
| 10:53:43 | 11 | **THE COURT:** Well, obstruction under -- as applied in |
| 10:53:45 | 12 | the presentence report is a 3C1.1 adjustment for obstructing |
| 10:54:03 | 13 | the administration of justice with respect to the prosecution. |
| 10:54:06 | 14 | And under the guideline, the obstructive conduct related to the |
| 10:54:14 | 15 | defendant's offense of conviction and any relevant conduct. |
| 10:54:16 | 16 | And, as Ms. McFadden points out, it's false testimony, |
| 10:54:24 | 17 | obviously, given during the course of a trial, made with intent |
| 10:54:27 | 18 | to deceive, and material to the issues in the case. |
| 10:54:34 | 19 | And, in this case, both Counts One and Two contain as |
| 10:54:38 | 20 | an element that the defendant acted because of the victim's |
| 10:54:43 | 21 | race and/or national origin -- or race and color in one |
| 10:54:51 | 22 | instance, and race and national origin in another instance, |
| 10:54:54 | 23 | making Mr. Hudak's state of mind relevant to the prosecution. |
| 10:55:03 | 24 | I think there are -- I recognize, I'll say, the |
| 10:55:09 | 25 | defendant's argument because the guidelines in the application |

10:55:18  1  note say the following:

10:55:21  2          This provision is not intended to punish a

10:55:24  3  defendant for the exercise of a constitutional right.

10:55:27  4  Obviously, that constitutional right being the right to testify

10:55:32  5  at trial when one is charged with an offense. And so -- and

10:55:42  6  here, I don't see that that right includes the right to commit

10:55:47  7  perjury while one is on the witness stand. But it does, I

10:55:51  8  think, as the guidelines suggest, or say specifically, that a

10:55:56  9  refusal to -- denial of guilt or refusal to admit guilt, those

10:56:03  10  type of things don't count.

10:56:05  11         And so, I look to more specific testimony that meets

10:56:10  12  both the requirements, both the guideline requirements as well

10:56:13  13  the Fourth Circuit in terms of false testimony, intent to

10:56:16  14  deceive, and material to the proceeding. Given that element

10:56:20  15  that I identified, that is, that Mr. Hudak acted because of

10:56:24  16  race and color or race and national origin was an element.

10:56:32  17  Testimony that was relevant to whether that fact existed or not

10:56:36  18  was certainly critical to the jury's decision-making process.

10:56:45  19         Another thing that I'll just mention is that when

10:56:49  20  Mr. Hudak testified, in listening to Mr. Hudak's testimony,

10:56:56  21  there were some things that Mr. Hudak said that just -- even

10:57:01  22  though no contrary -- evidence to the contrary was presented,

10:57:07  23  they certainly caused concern in terms of the truthfulness of

10:57:10  24  that testimony.

10:57:13  25         For example, Mr. Hudak's story about getting the

| | | |
|---|---|---|
| 10:57:17 | 1 | Confederate flag, or the relics, I can't remember which, from |
| 10:57:21 | 2 | some unknown person named Larry at a gas station or somewhere |
| 10:57:26 | 3 | else is just completely inconsistent with somebody who goes |
| 10:57:28 | 4 | home, hangs the flag on the back of the bedroom door or has the |
| 10:57:34 | 5 | relics on, more or less, open display in the home. |
| 10:57:37 | 6 | So in terms of my findings, I'd simply credit the |
| 10:57:48 | 7 | testimony of -- can't remember the witness's name -- of Justin |
| 10:57:58 | 8 | Smith in terms of Mr. Hudak's use of the N-word, and I find |
| 10:58:06 | 9 | that Mr. Hudak's denial of the use of the N-word, or, more |
| 10:58:12 | 10 | specifically, that he only used the N-word if somebody else |
| 10:58:15 | 11 | called him the N-word, I find that that testimony is just |
| 10:58:18 | 12 | false. |
| 10:58:19 | 13 | And, frankly, when the N-word is used in the manner |
| 10:58:23 | 14 | in which it was used as the evidence reflected in this case, |
| 10:58:28 | 15 | there are not many one-word terms that are more indicative of |
| 10:58:35 | 16 | racial animosity than that particular word; and I think the use |
| 10:58:40 | 17 | of that word was, in fact, relevant to the issues in the case. |
| 10:58:46 | 18 | Second, I'm sure the parties recall, but I was very |
| 10:58:48 | 19 | reluctant to let the Government introduce the Confederate flag |
| 10:59:00 | 20 | and Nazi memorabilia during its case-in-chief. But Mr. Hudak |
| 10:59:05 | 21 | testified and made a claim about the flag; that is, he denied |
| 10:59:13 | 22 | ever displaying -- it was a Nazi flag. I keep saying |
| 10:59:21 | 23 | Confederate flag. And, in fact, as evidenced by the testimony |
| 10:59:26 | 24 | of the probation officer, he did, in fact, display that flag. |
| 10:59:32 | 25 | So -- and I do -- I've reviewed all of -- all the |

Sentencing - May 1, 2024

| | | |
|---|---|---|
| 10:59:47 | 1 | statements identified by the United States in support of the |
| 10:59:48 | 2 | obstruction of just -- adjustment. It seems to me the N-word |
| 10:59:51 | 3 | in this particular case is the most pointed evidence of |
| 10:59:54 | 4 | perjury. |
| 10:59:54 | 5 | In terms of the punching, there was definitely a |
| 11:00:01 | 6 | dust-up out there. It's a little hard to confirm by video. |
| 11:00:06 | 7 | But I would be very comfortable saying that Mr. Hudak was |
| 11:00:08 | 8 | clearly the aggressor in that physical confrontation, started |
| 11:00:11 | 9 | that physical confrontation, and did, in fact, punch |
| 11:00:15 | 10 | Mr. Duarte. But it was a heated moment, so that's one that I |
| 11:00:20 | 11 | might otherwise give Mr. Hudak the benefit of the doubt on that |
| 11:00:25 | 12 | one. It's not very compelling, but I didn't -- that one's a |
| 11:00:31 | 13 | little bit of a closer call, I think. |
| 11:00:34 | 14 | But claims that he didn't know Justin Smith's race, |
| 11:00:37 | 15 | claims that he didn't use the N-word, and claiming, given his |
| 11:00:44 | 16 | use of the N-word, that he didn't chase him home because of his |
| 11:00:49 | 17 | race or color is simply false after having heard the testimony. |
| 11:00:54 | 18 | And I, therefore, find the plus two for obstruction should |
| 11:00:59 | 19 | apply. |
| 11:01:00 | 20 | Mr. Hudak, let me ask you. Have you reviewed the |
| 11:01:02 | 21 | presentence report in this case? |
| 11:01:04 | 22 | **THE DEFENDANT:** Excuse me, Your Honor? |
| 11:01:05 | 23 | **THE COURT:** Have you reviewed the presentence report |
| 11:01:06 | 24 | in this case? |
| 11:01:14 | 25 | **THE DEFENDANT:** Yes. |

Sentencing - May 1, 2024

| | | |
|---|---|---|
| 11:01:15 | 1 | **THE COURT:** And other than the objection that I just |
| 11:01:20 | 2 | addressed, that is, specifically, whether or not the |
| 11:01:22 | 3 | obstruction of justice should apply, do you agree with the |
| 11:01:27 | 4 | report? I guess maybe since he went to trial, I'll state it |
| 11:01:34 | 5 | differently. Are there any other objections to the report? |
| 11:01:45 | 6 | **MR. LESTER:** He objects to the fines issues which |
| 11:01:49 | 7 | we've discussed. |
| 11:01:50 | 8 | **THE COURT:** All right. And, yeah, I made my finding |
| 11:01:54 | 9 | on that. Any other objections to the report? |
| 11:02:00 | 10 | **MR. LESTER:** Right. So he's going to object to the |
| 11:02:04 | 11 | recommendations sections, the guideline range, that sort of |
| 11:02:08 | 12 | thing. But, in terms of factually, I think I've put all those |
| 11:02:13 | 13 | in the paper, and I think we've discussed them all, Your Honor. |
| 11:02:16 | 14 | **THE COURT:** And to be clear, Mr. Hudak, I understand |
| 11:02:18 | 15 | you went to trial on a plea of not guilty, the jury's rendered |
| 11:02:23 | 16 | its findings. And I'm not asking you right now or trying to |
| 11:02:28 | 17 | compel you to agree with what the jury found or the guideline |
| 11:02:29 | 18 | calculation, but I've addressed two objections. Are there any |
| 11:02:36 | 19 | other objections that I need to address before I adopt the |
| 11:02:38 | 20 | presentence report? |
| 11:03:08 | 21 | **MR. LESTER:** Right. So he's asking about probation, |
| 11:03:11 | 22 | those sorts of things. Again, I don't think that falls |
| 11:03:16 | 23 | within -- |
| 11:03:17 | 24 | **THE COURT:** The types of penalties? |
| 11:03:18 | 25 | **MR. LESTER:** Yeah, I don't think it falls within the |

| | | |
|---|---|---|
| 11:03:23 | 1 | scope of -- |
| 11:03:25 | 2 | **THE COURT:** Your lawyer's free to argue for whatever |
| 11:03:26 | 3 | sentence he thinks is appropriate on your behalf. So, I |
| 11:03:30 | 4 | don't -- so I'm going to find -- I'm going to adopt the |
| 11:03:36 | 5 | presentence report based on my ruling on the two objections |
| 11:03:38 | 6 | that you've lodged. And I just want to make sure there's |
| 11:03:40 | 7 | nothing else that I need to address at this time with respect |
| 11:03:40 | 8 | to the presentence report. I'm just going to note an objection |
| 11:03:46 | 9 | to the facts since he went to trial and just disputes those |
| 11:03:50 | 10 | facts. |
| 11:03:55 | 11 | **MR. LESTER:** Okay. He said to me, I don't think |
| 11:03:58 | 12 | anything else, Your Honor. |
| 11:04:00 | 13 | **THE COURT:** Is that correct, Mr. Hudak? |
| 11:04:00 | 14 | **THE DEFENDANT:** (Nodding.) |
| 11:04:01 | 15 | **THE COURT:** All right. Then you can have a seat. |
| 11:04:06 | 16 | Then I will adopt -- and I'll just make a note. I obviously |
| 11:04:12 | 17 | heard the testimony given at trial and overrule the objection |
| 11:04:16 | 18 | to the facts -- any remaining objections to the facts and the |
| 11:04:21 | 19 | guideline calculations. I will, therefore, adopt the |
| 11:04:27 | 20 | presentence investigation report without change. |
| 11:04:30 | 21 | The offense of conviction does not carry mandatory -- |
| 11:04:30 | 22 | the offenses of conviction do not carry mandatory minimum |
| 11:04:30 | 23 | sentences. As a matter of fact, I need to clean that one piece |
| 11:04:30 | 24 | up, don't I? |
| 11:04:36 | 25 | **PROBATION OFFICER:** Yes, Your Honor, paragraph 103. |

```
11:04:38   1          THE COURT:  Thank you.  Paragraph 103.  So, the
11:04:40   2  probation officer caught it everywhere else except in
11:04:44   3  paragraph 103.  And paragraph 103 still has Count One as a
11:04:47   4  felony, so I will adopt the presentence investigation report
11:04:50   5  with the following amendment:  And that is paragraph 103 is
11:04:55   6  amended to reflect that Count One -- the conviction on
11:04:58   7  Count One is a misdemeanor offense with a statutory maximum of
11:05:04   8  one-year imprisonment as correctly recited in paragraph 98.
11:05:10   9  And I think it's a one-year maximum supervised release term as
11:05:15  10  well.
11:05:15  11          PROBATION OFFICER:  Yes, Your Honor.
11:05:16  12          THE COURT:  Okay.  One-year term of supervised
11:05:19  13  release.
11:05:21  14          The resulting guideline calculation is as follows:
11:05:25  15          A total offense level of 17.
11:05:28  16          A criminal history category of III.
11:05:29  17          A guideline imprisonment range of 27 to 33 months.
11:05:33  18          A supervised release range of one to three years.
11:05:36  19          A fine range of 10,000 to $95,000.
11:05:40  20          And a special assessment of $100 is mandatory.
11:05:46  21          Will there be any additional -- oh, I'm sorry.
11:05:54  22  Criminal history category II.
11:05:57  23          Will there be any additional evidence, Mr. Lester?
11:05:59  24          MR. LESTER:  Yes, Your Honor.  We would call
11:06:01  25  Dr. Graney.
```

| | | |
|---|---|---|
| 11:06:05 | 1 | **THE COURT:** Dr. Graney, if you'll step up and be |
| 11:06:09 | 2 | sworn, please. |
| 11:06:22 | 3 | (At 11:06 a.m., witness sworn by the Clerk.) |
| 11:06:55 | 4 | **THE COURT:** You may proceed. |
| 03:23:41 | 5 | **DAWN GRANEY,** |
| 03:23:41 | | DEFENDANT'S WITNESS, SWORN |
| 03:23:41 | 6 | DIRECT EXAMINATION |
| 11:06:55 | 7 | **BY MR. LESTER:** |
| 11:06:56 | 8 | Q    Can you please state your name? |
| 11:06:58 | 9 | A    Dawn, D-A-W-N, Graney, G-R-A-N-E-Y. |
| 11:07:04 | 10 | Q    And where do you work? |
| 11:07:05 | 11 | A    I'm currently a private practice forensic psychologist. |
| 11:07:09 | 12 | **MR. LESTER:** All right. Your Honor, may I approach? |
| 11:07:10 | 13 | **THE COURT:** You may. |
| 11:07:26 | 14 | **BY MR. LESTER:** |
| 11:07:27 | 15 | Q    Dr. Graney, I've handed you two exhibits. Do you see the |
| 11:07:30 | 16 | document marked Defendant's Exhibit 2? |
| 11:07:32 | 17 | A    Yes. |
| 11:07:32 | 18 | Q    Can you identify that, please? |
| 11:07:33 | 19 | A    That's my curriculum vitae. |
| 11:07:39 | 20 | Q    And briefly, is it truthful and accurate? |
| 11:07:41 | 21 | A    Yes. |
| 11:07:42 | 22 | Q    And, briefly, what are you trained to do? |
| 11:07:51 | 23 | A    Specifically, forensic psychology. My graduate program |
| 11:07:58 | 24 | focused on a forensic specialty. I completed a forensic |
| 11:08:03 | 25 | internship and post-doctoral fellowship, and during my Bureau |

| | | |
|---|---|---|
| 11:08:08 | 1 | of Prisons career, I spent 14 years working as a forensic |
| 11:08:12 | 2 | psychologist. |
| 11:08:15 | 3 | Q    All right.  And that was what I was going to ask you next. |
| 11:08:15 | 4 | Currently, are you in private practice? |
| 11:08:15 | 5 | A    I am, yes. |
| 11:08:17 | 6 | Q    And what do you do in private practice? |
| 11:08:20 | 7 | A    Conduct court-ordered or requested evaluations typically |
| 11:08:32 | 8 | relating to competency, insanity, presentencing, and I also |
| 11:08:32 | 9 | conduct sex offender civil commitment evaluations under the |
| 11:08:35 | 10 | Adam Walsh Act. |
| 11:08:38 | 11 | Q    Prior to entering private practice, did you have |
| 11:08:38 | 12 | employment with the Bureau of Prisons? |
| 11:08:44 | 13 | A    I did.  I completed my internship there in 2000 to 2001, |
| 11:08:50 | 14 | and from 2001 to 2022, I performed various roles as a |
| 11:08:50 | 15 | psychologist. |
| 11:09:02 | 16 | Q    How many years did you work within the Bureau of Prisons? |
| 11:09:06 | 17 | A    Total, 22, 21 toward retirement. |
| 11:09:09 | 18 | Q    All right.  Another document that should be on your desk |
| 11:09:11 | 19 | is Defendant's Exhibit 1.  What is that? |
| 11:09:14 | 20 | A    That is the evaluation report I completed in March of this |
| 11:09:18 | 21 | year. |
| 11:09:19 | 22 | Q    Okay.  And did you have an opportunity to review Mr. |
| 11:09:21 | 23 | Hudak's medical records? |
| 11:09:23 | 24 | A    I did. |
| 11:09:24 | 25 | Q    And did you also have an opportunity to meet with |

| | | |
|---|---|---|
| 11:09:25 | 1 | Mr. Hudak? |
| 11:09:27 | 2 | A    I did.  I met with him on two occasions in September of |
| 11:09:30 | 3 | 2023 for approximately 11 to 12 hours. |
| 11:09:35 | 4 | Q    Okay.  So you met with him on one occasion? |
| 11:09:39 | 5 | A    Two occasions. |
| 11:09:40 | 6 | Q    All right.  And what was the other occasion? |
| 11:09:47 | 7 | A    They were both in September. |
| 11:09:49 | 8 | Q    Okay. |
| 11:09:49 | 9 | A    Two separate dates in September. |
| 11:09:51 | 10 | Q    And the total time you spent with Mr. Hudak? |
| 11:09:53 | 11 | A    It was -- it was, like, 11 hours, 45 minutes, roughly. |
| 11:09:59 | 12 | Q    Okay.  And what did your work on -- with Mr. Hudak show |
| 11:10:05 | 13 | you in terms of his medical history and his medical diagnosis? |
| 11:10:08 | 14 | A    So, from the materials I reviewed and from interviewing |
| 11:10:10 | 15 | Mr. Hudak, he has a significant mental health history dating |
| 11:10:13 | 16 | back to at least around 2006.  He had a car accident at that |
| 11:10:18 | 17 | time, suffered some pretty significant back injuries; had two |
| 11:10:20 | 18 | additional car accidents in 2007, another in 2011, which |
| 11:10:24 | 19 | exacerbated chronic pain issues that he was having. |
| 11:10:27 | 20 |         And it appeared that the 2006 accident and then the |
| 11:10:30 | 21 | subsequent accidents resulted in the onset of a number of |
| 11:10:31 | 22 | different mental health conditions that he reported no prior |
| 11:10:34 | 23 | history of.  And since that time, he has been routinely |
| 11:10:38 | 24 | involved in psychiatric and psychological treatment to help him |
| 11:10:43 | 25 | manage those conditions. |

| | | |
|---|---|---|
| 11:10:45 | 1 | Q   And what type of diagnoses does Mr. Hudak have? |
| 11:10:51 | 2 | A   His diagnoses, which have been well reflected in the |
| 11:10:56 | 3 | records, were obsessive-compulsive disorder, generalized |
| 11:11:01 | 4 | anxiety disorder, delusional disorder persecutory type, a |
| 11:11:04 | 5 | history of major depressive disorder, and a history of alcohol |
| 11:11:08 | 6 | use disorder. |
| 11:11:10 | 7 | Q   All right.  And, based on your time that you spent with |
| 11:11:12 | 8 | Mr. Hudak, were those diagnoses consistent with his |
| 11:11:18 | 9 | presentation or inconsistent? |
| 11:11:20 | 10 | A   So, the active diagnoses would be the obsessive-compulsive |
| 11:11:33 | 11 | disorder and the generalized anxiety disorder.  He has reported |
| 11:11:33 | 12 | persisting issues with those diagnoses over the years and |
| 11:11:33 | 13 | described things during our interviews which remain consistent |
| 11:11:40 | 14 | with those diagnoses. |
| 11:11:41 | 15 | Major depressive disorder, he has had repeated |
| 11:11:44 | 16 | episodes in his life, but he is considered in full remission at |
| 11:11:52 | 17 | this time, which basically means he's gone at least a period of |
| 11:11:56 | 18 | two months without meeting full criteria for the disorder. |
| 11:11:58 | 19 | Same thing with this alcohol use disorder.  It would |
| 11:12:03 | 20 | be considered in remission as of now.  No significant evidence |
| 11:12:04 | 21 | of alcohol use problems in at least a 12-month period. |
| 11:12:08 | 22 | Q   Did you also mention a delusional diagnosis? |
| 11:12:11 | 23 | A   Delusional disorder, which has been considered to be in |
| 11:12:15 | 24 | partial remission.  He does have persisting delusions, but |
| 11:12:18 | 25 | those have -- according to the records, have not interfered |

| | | |
|---|---|---|
| 11:12:22 | 1 | with his functioning as significantly in recent years as it has |
| 11:12:24 | 2 | in the past. |
| 11:12:26 | 3 | Q    All right.  What type of symptoms would someone with OCD, |
| 11:12:27 | 4 | or, in this case, Mr. Hudak's Hudak OCD manifest? |
| 11:12:32 | 5 | A    So OCD is either obsessions, which are intrusive, |
| 11:12:49 | 6 | unwanted, persistent thoughts and compulsions which are |
| 11:12:51 | 7 | behaviors often engaged in to try to reduce the anxiety |
| 11:12:52 | 8 | associated with the obsessive thinking.  In his case, he has |
| 11:12:54 | 9 | both the obsessions and the compulsions, and they stem around |
| 11:12:59 | 10 | fears of germs, contamination, cleanliness.  He likes things |
| 11:13:05 | 11 | very neat and orderly.  He takes multiple showers during the |
| 11:13:10 | 12 | day.  He frequently washes his hands.  He has refused medical |
| 11:13:15 | 13 | procedures in the past due to fears of some form of |
| 11:13:18 | 14 | contamination. |
| 11:13:19 | 15 | But he also has fears that kind of tie in with |
| 11:13:24 | 16 | this -- these paranoid delusions about being followed, being |
| 11:13:28 | 17 | spied on, being stalked.  He believes that -- he has believed |
| 11:13:36 | 18 | in the past that people were watching him through video devices |
| 11:13:38 | 19 | in his home.  And so, he would repeatedly engage in behaviors |
| 11:13:42 | 20 | like looking out his windows to make sure he wasn't being |
| 11:13:47 | 21 | watched or followed, repeatedly checking the locks on his |
| 11:13:50 | 22 | doors, and things of that nature in response to those |
| 11:13:56 | 23 | delusional and obsessive beliefs. |
| 11:13:58 | 24 | Q    And how does the anxiety disorder manifest itself in |
| 11:14:00 | 25 | symptoms with Mr. Hudak? |

| | | |
|---|---|---|
| 11:14:02 | 1 | A    So generalized anxiety disorder is just excessive |
| 11:14:06 | 2 | persistent worry.  Individuals with -- they call it GAD, for |
| 11:14:16 | 3 | short -- tend to kind of catastrophize situations.  Those |
| 11:14:22 | 4 | individuals that have both OCD and generalized anxiety disorder |
| 11:14:24 | 5 | tend to have a more severe form of anxiety.  Those individuals |
| 11:14:28 | 6 | can tend to have difficulty regulating their emotions.  They |
| 11:14:31 | 7 | have difficulty with more ambiguous situations.  They tend to |
| 11:14:33 | 8 | perceive things as more threatening than they might be in |
| 11:14:35 | 9 | reality.  They have difficulty regulating emotion.  They can |
| 11:14:41 | 10 | have anger outbursts, even rage episodes at times.  So, just a |
| 11:14:46 | 11 | lot of kind of fearfulness, anxiety, kind of being tightly |
| 11:14:51 | 12 | wired, and being a little more reactive than the average |
| 11:14:55 | 13 | individual. |
| 11:14:56 | 14 | Q    Have you had an opportunity to familiarize yourself with |
| 11:14:58 | 15 | the offense conduct in Mr. Hudak's case? |
| 11:15:03 | 16 | A    I -- during the course of the evaluation, I was provided |
| 11:15:07 | 17 | materials that included descriptions of the offense conduct.  I |
| 11:15:10 | 18 | do want to say my evaluation was never specifically focused on |
| 11:15:14 | 19 | assessing mental state at the time of the offenses, but I am |
| 11:15:20 | 20 | familiar with the offense conduct, yes. |
| 11:15:23 | 21 | Q    Are you familiar that the offense conduct occurred on |
| 11:15:26 | 22 | November 26 of 2021, and another incident on October 13 of |
| 11:15:30 | 23 | 2022? |
| 11:15:36 | 24 | A    Correct, yes. |
| 11:15:42 | 25 | Q    Are you also aware that, generally, conduct known as |

Case 1:23-cr-00231-WO   Document 87   Filed 08/19/24   Page 21 of 82

11:15:43  1  relevant conduct occurred from March of 2020 through December

11:15:44  2  of 2022?

11:15:46  3  A     Correct.

11:15:46  4  Q     Now, based on your review of his records and your meetings

11:15:47  5  with Mr. Hudak, and based on your professional experience, do

11:15:47  6  you have an opinion whether his mental diagnoses and symptoms

11:15:52  7  were active during these periods of offense or relevant

11:15:54  8  conduct?

11:15:55  9  A     I would say during the 2020 to 2022 period, the records

11:15:59 10  would reflect, and even some of his statements during our

11:16:02 11  interviews would suggest that he was experiencing continued

11:16:06 12  symptoms of at least of the obsessive-compulsive disorder and

11:16:11 13  the generalized anxiety disorder and some persisting paranoid

11:16:15 14  delusions related to the delusional disorder.

11:16:18 15          You know, OCD and the generalized anxiety disorder,

11:16:26 16  they're considered chronic conditions.  They certainly can

11:16:29 17  fluctuate.  So, they might have days or weeks that they're

11:16:31 18  doing better or periods where their symptoms worsen,

11:16:34 19  particularly during periods of stress.

11:16:36 20          But I would say, during that time, considering his

11:16:39 21  history, he's had those active diagnoses for many years now.

11:16:44 22  Again, these are chronic conditions.  I do believe those

11:16:48 23  disorders remained active and present during that 2020 to 2022

11:16:53 24  time period.

11:16:53 25  Q     How are the symptoms expressed by Mr. Hudak's mental

| | | |
|---|---|---|
| 11:17:00 | 1 | diagnoses consistent or inconsistent with the behaviors |
| 11:17:02 | 2 | demonstrated in the offense conduct? |
| 11:17:05 | 3 | A    So I think I see it as a contributing or an exacerbating |
| 11:17:11 | 4 | factor.  Certainly, his behavior was not caused by the mental |
| 11:17:14 | 5 | health conditions.  But because he is someone that does tend to |
| 11:17:19 | 6 | be more reactive, who has difficulty managing his emotions, who |
| 11:17:23 | 7 | has frequent conflict with others, he tends to be argumentative |
| 11:17:28 | 8 | and irritable, and I think those do tie in with these |
| 11:17:32 | 9 | particular diagnoses, these co-morbid diagnoses that he has. |
| 11:17:36 | 10 |         And so, I can see instances where he perceives |
| 11:17:39 | 11 | something as either a threat or particularly disturbing or |
| 11:17:47 | 12 | upsetting to him, that he could be more reactive, again, than |
| 11:17:51 | 13 | maybe some other individuals that can better, you know, |
| 11:17:52 | 14 | moderate their behavior and respond in a more appropriate |
| 11:17:57 | 15 | manner. |
| 11:17:57 | 16 | Q    How are the mental health diagnoses that are active with |
| 11:18:05 | 17 | Mr. Hudak, the OCD, the anxiety disorder, the delusional |
| 11:18:15 | 18 | disorder, how are those treated? |
| 11:18:19 | 19 | A    Medication treatment is one.  Psychological treatment, |
| 11:18:21 | 20 | some form of therapy is also recommended for each of those |
| | 21 | conditions.  You would not rely just on medication treatment |
| 11:18:32 | 22 | for any one of those, really, to see -- to see the best |
| 11:18:36 | 23 | results. |
| 11:18:36 | 24 |         Records supported that he has been on medication |
| 11:18:38 | 25 | treatment pretty consistently for a number of years.  And he |

Sentencing - May 1, 2024

11:18:42  1   does respond fairly well to medications.  He's often described
11:18:50  2   as "stable."  "Stable" does not mean an absence of symptoms.
11:18:55  3   It means that there's no significant impairment such that
11:18:57  4   they're not able to kind of function and take care of daily
11:19:00  5   activities.
11:19:01  6         I'm not sure if his providers were fully aware of
11:19:03  7   some of the issues he was having in the community.  The records
11:19:11  8   don't necessarily -- I don't recall them reflecting that he was
11:19:14  9   having legal issues or that he had been having this level of
11:19:16  10  conflict with others in the community, so I'm not sure how much
11:19:19  11  of that was addressed in his treatment.
11:19:22  12        And it was also unclear from the records how much
11:19:23  13  individual therapy he might have received.  A lot of it seemed
11:19:25  14  medication-focused.
11:19:27  15        So he was consistently involved in treatment.  I'm
11:19:30  16  just not sure, again, to what extent the treatment providers
11:19:33  17  were fully aware of some of the behaviors he was engaging in,
11:19:36  18  some of his presentation, and to what degree they were working
11:19:40  19  with him, again, from a therapeutic standpoint to help him
11:19:40  20  learn to better manage some of these behaviors.
11:19:43  21  Q    Would you recommend that Mr. Hudak continue with
11:19:45  22  medication treatment?
11:19:46  23  A    Absolutely.
11:19:47  24  Q    You mentioned therapy, psychological treatment.  What does
11:19:50  25  that consist of?

| | | |
|---|---|---|
| 11:19:52 | 1 | A    So individual therapy is really -- is working with a |
| 11:19:56 | 2 | provider, a therapist, to really help the individual recognize |
| 11:20:03 | 3 | their mental health symptoms, help them understand how they |
| 11:20:05 | 4 | present for them, and to help them learn to better manage |
| 11:20:10 | 5 | those.  There are a variety of different forms of treatment. |
| 11:20:17 | 6 | It kind of depends on the disorder and on the individual what |
| 11:20:19 | 7 | ones might be most effective for him.  And, again, the records |
| 11:20:23 | 8 | suggested some degree of therapy; I just don't know the details |
| 11:20:24 | 9 | of that. |
| 11:20:26 | 10 | Q    Okay.  Does your record review suggest that the therapy, |
| 11:20:28 | 11 | psychological treatment with specific focus on his issues in |
| 11:20:34 | 12 | the community may have been lacking in the past based on your |
| 11:20:39 | 13 | review? |
| 11:20:41 | 14 | A    I would -- again, I'm not sure the providers were aware of |
| 11:20:44 | 15 | some of the things going on in the community, and so, yes, I |
| 11:20:50 | 16 | would say there was -- there was an absence of -- appeared to |
| 11:20:50 | 17 | be an absence of any treatment focused on those issues. |
| 11:20:54 | 18 | Q    Based on your experience in the Bureau of Prisons and the |
| 11:20:59 | 19 | programs that they have available, would Mr. Hudak receive |
| 11:21:03 | 20 | this -- likely receive this type of therapy, psychological |
| 11:21:05 | 21 | treatment that you would recommend for him? |
| 11:21:06 | 22 | A    So, the Bureau of Prisons has a lot of wonderful programs. |
| 11:21:09 | 23 | They have a lot of very dedicated, experienced clinicians.  The |
| 11:21:13 | 24 | reasons there are so many programs is you can help a larger |
| 11:21:17 | 25 | number of inmates with a fewer amount of staff than you can |

| | | |
|---|---|---|
| 11:21:21 | 1 | with individual one-on-one therapy. |
| 11:21:23 | 2 | There is brief counseling that's available.  It's |
| 11:21:25 | 3 | generally for those inmates that are having problems actively |
| 11:21:29 | 4 | functioning within the institution such that they are -- their |
| 11:21:34 | 5 | symptom presentation is causing them significant distress, they |
| 11:21:37 | 6 | can't perform kind of their daily living activities, they're |
| 11:21:40 | 7 | cautioning disruptions in the institutions. |
| 11:21:44 | 8 | And so, those tend to be the individuals that get |
| 11:21:46 | 9 | more of the individual, kind of one-on-one approach to help |
| 11:21:50 | 10 | them manage their symptoms and manage their conduct while in |
| 11:21:52 | 11 | the prison setting.  And that's just because of staffing. |
| 11:21:57 | 12 | There simply isn't enough staffing to handle the number of |
| 11:22:00 | 13 | inmates that need that kind of one-on-one care. |
| 11:22:05 | 14 | So he would receive some degree of care.  Certainly, |
| 11:22:08 | 15 | he would continue to receive psychiatric treatment.  He could |
| 11:22:15 | 16 | take advantage of what programs are available.  He might |
| 11:22:19 | 17 | receive some degree of brief counseling. |
| 11:22:21 | 18 | My guess is, based on how he was doing in jail, he's |
| 11:22:25 | 19 | not somebody that may rise to the level of being seen on a |
| 11:22:27 | 20 | routine basis, so I don't think he would receive the individual |
| 11:22:30 | 21 | therapy that I think he would most benefit from to really help |
| 11:22:33 | 22 | him particularly learn to manage this kind of unique |
| 11:22:35 | 23 | combination of disorders that he has. |
| 11:22:39 | 24 | Q    Are the type of treatments that you would recommend for |
| 11:22:42 | 25 | him that may not be available at the Bureau of Prisons, are |

| | | |
|---|---|---|
| 11:22:45 | 1 | they available in the community? |
| 11:22:47 | 2 | A     So, you would have more providers available to provide |
| 11:22:51 | 3 | individual therapy in a community setting than you would |
| 11:22:52 | 4 | typically in a prison setting. |
| 11:22:54 | 5 | Q     And, if you know, how long might someone like Mr. Hudak |
| 11:22:58 | 6 | require medication and therapy treatment for these types of |
| 11:23:01 | 7 | conditions? |
| 11:23:03 | 8 | A     So, the medication treatment certainly can be lifelong. |
| 11:23:06 | 9 | Therapy, it really depends.  It really depends on his response |
| 11:23:10 | 10 | to the therapy, his relationship with the therapist.  There are |
| 11:23:14 | 11 | a number of factors that can affect how long he might need that |
| 11:23:19 | 12 | level of treatment.  It's just kind of hard to say right now. |
| 11:23:23 | 13 | **MR. LESTER:**  Those are my questions, Your Honor. |
| 11:23:25 | 14 | **THE COURT:**  Cross-examination? |
| 11:23:26 | 15 | **MS. McFADDEN:**  Thank you, Your Honor. |
| 11:23:26 | 16 | CROSS-EXAMINATION |
| 11:23:26 | 17 | **BY MS. McFADDEN:** |
| 11:23:27 | 18 | Q     Good morning, Dr. Graney. |
| 11:23:29 | 19 | A     Good morning. |
| 11:23:29 | 20 | Q     So, you prepared two reports in this particular case, is |
| 11:23:32 | 21 | that correct? |
| 11:23:33 | 22 | A     Correct. |
| 11:23:35 | 23 | Q     And the first was from October 2023, is that correct? |
| 11:23:38 | 24 | A     Correct. |
| 11:23:39 | 25 | Q     And that was just to determine Mr. Hudak's competency to |

| | | |
|---|---|---|
| 11:23:42 | 1 | stand trial, is that right? |
| 11:23:43 | 2 | A    Correct, yes. |
| 11:23:44 | 3 | Q    So there were no assertions in that report establishing a |
| 11:23:49 | 4 | causal nexus between the disorders identified from his records |
| 11:23:52 | 5 | and the offense conduct? |
| 11:23:54 | 6 | A    Correct, yes. |
| 11:23:55 | 7 | Q    And in terms of the evidence in this case, so to speak, |
| 11:24:00 | 8 | you've not reviewed the Government's full discovery file, is |
| 11:24:04 | 9 | that correct? |
| 11:24:04 | 10 | A    Correct. |
| 11:24:05 | 11 | Q    And you haven't reviewed any transcripts from the trial |
| 11:24:08 | 12 | testimony, is that right? |
| 11:24:10 | 13 | A    Correct, I have not. |
| 11:24:11 | 14 | Q    And you haven't seen any of the demonstrative evidence or |
| 11:24:14 | 15 | physical evidence from the trial, is that right? |
| 11:24:16 | 16 | A    Correct. |
| 11:24:18 | 17 | Q    I just want to touch on a couple of things that Mr. Lester |
| 11:24:25 | 18 | discussed with you.  I believe that you just testified |
| 11:24:29 | 19 | regarding the availability of certain mental health treatment |
| 11:24:32 | 20 | programs in the Bureau of Prisons that, based on how Mr. Hudak |
| 11:24:36 | 21 | was doing in jail, he may not qualify for some of the more |
| 11:24:40 | 22 | intense ones, is that correct? |
| 11:24:42 | 23 | A    Correct. |
| 11:24:42 | 24 | Q    When you say, "how he was doing in jail," what do you mean |
| 11:24:45 | 25 | by that? |

11:24:45  1   A    Well, he reported that he was feeling fairly well in jail.
11:24:49  2   And what I sometimes will see with individuals is, because jail
11:24:53  3   or prison environments are so structured and controlled and
11:24:57  4   contained, that sometimes, they do better because they have
11:25:00  5   that order and that structure, and they don't have some of the
11:25:04  6   same stress that they would in the community setting, things
11:25:07  7   like taking care of family matters, paying, you know, bills,
11:25:11  8   financial stressors, and things of that nature.  And he kind of
11:25:13  9   said some of that.  Some of the stress that he was experiencing
11:25:16  10  in the community, he wasn't experiencing in the jail setting.
11:25:19  11          And so, assuming he goes in the Bureau of Prisons'
11:25:24  12  custody, he's complying with medications, and he appears
11:25:29  13  generally stable, again, he's able to go about his daily
11:25:32  14  business, he's not causing conflict, he's not a management
11:25:35  15  issue in the prison, I don't imagine he's the type of
11:25:37  16  individual that would come to the attention of psychology other
11:25:43  17  than that he has a history of mental health issues.
11:25:48  18  Q    And I believe you had referenced something about his
11:25:53  19  problems in the community, is that right, in the context of
11:25:58  20  information his providers had available to them?
11:26:03  21  A    Well, I assume they say -- I'm not sure they were fully
11:26:03  22  aware of some of the issues he was -- the repeated conflicts
11:26:03  23  and the level of conflicts he was having in the community with
11:26:05  24  others.
11:26:06  25  Q    And this is based on your review of medical records that

11:26:10  1  date back a number of years, is that right?

11:26:11  2  A    Yes, from, I think, 2011 to 2022, maybe early 2023.

11:26:18  3  Q    And so, those records would reflect what Mr. Hudak had

11:26:22  4  volunteered to his health care providers, is that right?

11:26:24  5  A    Correct.

11:26:25  6  Q    Just like your opinion would be based, again, in part, on

11:26:28  7  things that he provided to you in terms of representations he

11:26:30  8  made to you, is that right?

11:26:33  9  A    His -- the interview, and then, yes, the number of records

11:26:37 10  that were available, yes.

11:26:38 11  Q    In terms of the diagnostic impressions, which I believe

11:26:42 12  are the same in both of the reports, is it correct that the

11:26:46 13  delusional disorder you've identified as being in partial

11:26:50 14  remission?

11:26:50 15  A    Yes, it was considered in partial remission, and this was

11:26:57 16  identified in the records.  He's had some persisting, like,

11:27:01 17  persecutory beliefs, you know, believe still that, sometimes,

11:27:14 18  he's being followed, or at one point, he reported being stalked

11:27:14 19  or that he's being watched, but didn't rise to the level of --

11:27:14 20  based on what he was providing to the providers, that it was

11:27:14 21  causing significant impairment in his daily functioning.

11:27:16 22  Q    And did you also identify that the major depressive

11:27:19 23  disorder was in full remission?

11:27:22 24  A    Yes.

11:27:23 25  Q    And did you identify that the alcohol use disorder was

Case 1:23-cr-00231-WO    Document 87    Filed 08/19/24    Page 30 of 82

| | | |
|---|---|---|
| 11:27:25 | 1 | moderate and in sustained remission? |
| 11:27:28 | 2 | A    Correct, yes. |
| 11:27:29 | 3 | Q    And just to circle back on one other thing.  You're not |
| 11:27:31 | 4 | opining today that the behavior that he engaged in, that he was |
| 11:27:35 | 5 | charged with, was caused by these mental health conditions, are |
| 11:27:38 | 6 | you? |
| 11:27:39 | 7 | A    No.  I'm not saying they caused his behavior.  I think |
| 11:27:42 | 8 | some of his mental health conditions contribute to his poor |
| 11:27:48 | 9 | behavior regulation, yeah. |
| 11:27:50 | 10 | **MS. McFADDEN:**  Your Honor, may I have one moment? |
| 11:27:52 | 11 | **THE COURT:**  Um-hum. |
| 11:27:54 | 12 | **MS. McFADDEN:**  Your Honor, those would be my |
| 11:27:56 | 13 | questions.  Thank you. |
| 11:28:00 | 14 | **THE COURT:**  Well, Dr. Graney, as long as I have you |
| 11:28:04 | 15 | here, maybe you can answer a question that persists with me in |
| 11:28:06 | 16 | a number of different environments and circumstances, |
| 11:28:13 | 17 | sentencings to all kinds of cases, and that's this: |
| 11:28:21 | 18 | I'm a lawyer/judge, you're a psychologist, and so we |
| 11:28:21 | 19 | may have different perspectives on this, and I'm curious to |
| 11:28:21 | 20 | hear yours. |
| 11:28:25 | 21 | **THE WITNESS:**  Certainly. |
| 11:28:25 | 22 | **THE COURT:**  The question is, so there are -- people |
| 11:28:27 | 23 | act for all different kinds of reasons.  Sometimes they act |
| 11:28:30 | 24 | because they have psychological conditions.  Sometimes they act |
| 11:28:32 | 25 | because they're greedy.  Sometimes they act because they like |

| | | |
|---|---|---|
| 11:28:36 | 1 | something.  There's all kinds of motivations for acting.  And, |
| 11:28:39 | 2 | in your first report, I think this sentence was in your first |
| 11:28:43 | 3 | report, too, there's a note: |
| 11:28:46 | 4 | In June 2021, Mr. Hudak reported some problems with |
| 11:28:49 | 5 | neighbors reporting political conflicts. |
| 11:28:53 | 6 | **THE WITNESS:**  Correct. |
| 11:28:54 | 7 | **THE COURT:**  That's on page 7.  So, with respect to |
| 11:28:58 | 8 | Mr. Hudak, if I were a provide -- treatment provider, I would |
| 11:29:06 | 9 | look at that and go, well, it's 2021, everybody's having |
| 11:29:10 | 10 | problems with political conflicts, so that's no big deal. |
| 11:29:14 | 11 | But if the answer actually is, there's way more to it |
| 11:29:18 | 12 | than political conflicts, there were other things going on, and |
| 11:29:24 | 13 | I think this goes on to, say, March 2022.  So six plus three, |
| 11:29:34 | 14 | nine months later, he describes a worsening of OCD symptoms and |
| 11:29:40 | 15 | the next month says, I'm doing better overall. |
| 11:29:44 | 16 | Nowhere during that time period does Mr. Hudak say, |
| 11:29:46 | 17 | I've been riding around Cabarrus County calling black people |
| 11:29:50 | 18 | the N-word, or I've been threatening black people, or I've done |
| 11:29:58 | 19 | this, or I've done that.  None of the evidence that was |
| 11:30:02 | 20 | presented at trial was ever presented to a treatment provider. |
| 11:30:09 | 21 | And so, the question kind of boils down to this.  If |
| 11:30:12 | 22 | I, an individual, know I have problems, but I don't disclose |
| 11:30:19 | 23 | what might be -- actions which might be the product of those |
| 11:30:26 | 24 | mental health problems, I never seek any treatment specifically |
| 11:30:30 | 25 | for these problematic behaviors.  I just go in and say, yeah, |

11:30:35   1   you know, I'm looking out my window, I'm paranoid, and I'm
11:30:39   2   having political problems.
11:30:40   3          Looking at it as a judge, I will have to -- I confess
11:30:46   4   that, in my mind, that is something of a choice by an
11:30:52   5   individual to continue to engage in behaviors if you're
11:30:56   6   depriving the treatment provider of an opportunity to become
11:31:00   7   aware of the behaviors and address them directly instead of
11:31:04   8   this indirect route.
11:31:06   9          That may be harsh on my part, and you may disagree
11:31:08  10   with my assessment, and I'm curious to hear your response to
11:31:13  11   that.
11:31:15  12          **THE WITNESS:**  Well, Your Honor, you know, I really
11:31:17  13   think it depends on the individual.  And, certainly, I think
11:31:20  14   there could be situations where somebody knows they're engaging
11:31:24  15   in problematic, wrongful behavior, and they are intentionally
11:31:27  16   not disclosing that to the provider, for whatever reason.
11:31:32  17          And then, there could be cases where they really may
11:31:36  18   not link some of their behaviors with the mental health
11:31:40  19   conditions.  There may be a lack of insight there.  For
11:31:44  20   example, when you think of somebody with an anxiety disorder or
11:31:50  21   obsessive-compulsive disorder, you do think of a lot of
11:31:58  22   anxiety.  People think worry and tension and fearfulness.
11:32:02  23   There's a lot of anger and irritability and even aggressiveness
11:32:03  24   that can go along with anxiety disorders, depressive disorders,
11:32:03  25   obsessive-compulsive disorder.  And so, somebody might be

Case 1:23-cr-00231-WO   Document 87   Filed 08/19/24   Page 33 of 82

| | | |
|---|---|---|
| 11:32:05 | 1 | lashing out at others, and may not really be aware that that is |
| 11:32:09 | 2 | a component of part of the mental health disorder. |
| 11:32:14 | 3 | So, again, you know, I think it kind of depends on |
| 11:32:16 | 4 | the situation or the individual.  It could be very intentional |
| 11:32:20 | 5 | that they're not disclosing that.  It could be a lack of |
| 11:32:26 | 6 | recognition or insight that their behavior, one, is that |
| 11:32:30 | 7 | problematic, and that it possibly is related to or exacerbated |
| 11:32:32 | 8 | by the mental health conditions that they -- that they suffer |
| 11:32:36 | 9 | from. |
| 11:32:40 | 10 | THE COURT:  And, Mr. Hudak had been receiving |
| 11:32:40 | 11 | treatment for an extended period of time.  And, maybe I'm wrong |
| 11:32:49 | 12 | in assuming this, but I would have assumed that, at some point |
| 11:32:51 | 13 | in time, the treatment providers would be saying, here's what |
| 11:32:51 | 14 | we think you have, and here's what -- here are the symptoms we |
| 11:32:57 | 15 | think are coming from this, and here's what we think you ought |
| 11:32:58 | 16 | to do.  They have those conversations, don't they? |
| 11:33:05 | 17 | THE WITNESS:  They should be, yes. |
| 11:33:06 | 18 | THE COURT:  Okay.  So I understand your point.  Any |
| 11:33:10 | 19 | follow-up questions? |
| 11:33:11 | 20 | MS. McFADDEN:  No, Your Honor. |
| 11:33:12 | 21 | MR. LESTER:  No, Your Honor. |
| 11:33:13 | 22 | THE COURT:  All right.  Dr. Graney, thank you. |
| 11:33:16 | 23 | THE WITNESS:  Thank you. |
| 11:33:16 | 24 | (Witness excused.) |
| 11:33:16 | 25 | THE COURT:  Further evidence, Mr. Lester? |

| | | |
|---|---|---|
| 11:33:17 | 1 | **MR. LESTER:** No. |
| 11:33:18 | 2 | **THE COURT:** Any evidence, Ms. McFadden? |
| 11:33:20 | 3 | **MS. McFADDEN:** Nothing from the United States, Your |
| 11:33:21 | 4 | Honor. |
| 11:33:21 | 5 | **THE COURT:** All right. We're in a little bit of |
| 11:33:24 | 6 | trouble here. I'm going to have to shut it down at -- between |
| 11:33:33 | 7 | 10 till and 5 till -- 5 till 12. I have a Teams meeting at |
| 11:33:38 | 8 | noon that I have to get started. |
| 11:33:42 | 9 | So, I don't know how long this is going to take. I |
| 11:33:47 | 10 | think the best I can do is let's go till I have to stop, and |
| 11:33:51 | 11 | then we can come back at one or 1:30. Mr. Lester, are you |
| 11:34:00 | 12 | available? |
| 11:34:01 | 13 | **MR. LESTER:** I'm sorry? |
| 11:34:02 | 14 | **THE COURT:** Are you available to do that? |
| 11:34:04 | 15 | **MR. LESTER:** Yes, Your Honor. |
| 11:34:05 | 16 | **THE COURT:** All right. Well, I'll hear from the |
| 11:34:07 | 17 | parties at this time, then, as to what constitutes a sentence |
| 11:34:11 | 18 | that is sufficient but not greater than necessary, taking into |
| 11:34:14 | 19 | consideration the advisory guideline calculation as well as the |
| 11:34:19 | 20 | factors listed under 18 USC Section 3553. |
| 11:34:23 | 21 | Mr. Lester? |
| 11:34:24 | 22 | **MR. LESTER:** Your Honor, Mr. Hudak lived a |
| 11:34:27 | 23 | law-abiding life for most of his adult period. |
| 11:34:35 | 24 | He had a difficult upbringing. He emigrated to the |
| 11:34:38 | 25 | United States when he was approximately 21. He married. He |

| | | |
|---|---|---|
| 11:34:41 | 1 | worked.  He had two children, and, essentially, no criminal |
| 11:34:45 | 2 | activity. |
| 11:34:47 | 3 | But his life changed sometime between 2006 and 2011. |
| 11:34:52 | 4 | He suffered car accidents which were very serious, required |
| 11:35:06 | 5 | dependency on pain medication for a period of time, surgeries |
| 11:35:06 | 6 | made him unable to work, and he developed these mental health |
| 11:35:10 | 7 | diagnoses that you've heard about.  And these are serious |
| 11:35:15 | 8 | mental health diagnoses.  The OCD, the delusional disorder, the |
| 11:35:29 | 9 | persecutory type paranoia, the anxiety disorder, occasionally |
| 11:35:33 | 10 | depressive symptoms, occasionally alcohol abuse, the anger. |
| 11:35:37 | 11 | All of these issues were treated, to some degree, |
| 11:35:38 | 12 | with medication but perhaps not as thoroughly as required as |
| 11:35:43 | 13 | necessary with therapeutic treatment.  Perhaps there was an |
| 11:35:45 | 14 | inability for Mr. Hudak to link the problems that he was having |
| 11:35:50 | 15 | in the community with the diagnoses. |
| 11:35:54 | 16 | And because of these diagnoses, he received a |
| 11:36:02 | 17 | disability determination.  He was found to be unable to work, |
| 11:36:05 | 18 | and he was provided disability payments.  His -- and his |
| 11:36:10 | 19 | marriage suffered.  He separated, and he moved to a separate |
| 11:36:16 | 20 | home on Red Bird Circle in Concord.  And during this time, he |
| 11:36:25 | 21 | adopted political views and decided to put these messages on |
| 11:36:27 | 22 | his truck and on his house. |
| 11:36:30 | 23 | These statements and messages, he believed, were |
| 11:36:32 | 24 | protected under the First Amendment.  They demonstrated a |
| 11:36:40 | 25 | support for Trump.  They just demonstrated an aversion to |

11:36:44  1  illegal immigration.  He was very pro-law enforcement at a time
11:36:49  2  when law enforcement was under attack for excessive force and
11:36:51  3  may not have been popular in certain parts of the community.
11:36:56  4  He displayed flags that were American and Confederate.
11:37:00  5          And all of these behaviors drew attention to himself,
11:37:04  6  and he liked that attention, to some degree, because some of it
11:37:08  7  was positive.
11:37:10  8          Some people, law enforcement, some black individuals,
11:37:17  9  and others liked his messaging, and would take pictures with
11:37:21  10 him and support him and encourage him.  But many others did
11:37:24  11 not.  And they were negative interactions with people in the
11:37:27  12 community.  And some of those negative interactions resulted in
11:37:31  13 the offense conduct.
11:37:33  14         And, during this period, he continued to suffer from
11:37:37  15 these mental health issues; were not in remission.  They were
11:37:49  16 not properly treated.  And some of these mental health issues
11:37:52  17 might, I contend, were a proximate cause of the offense
11:37:56  18 conduct.  The jury instruction said that all the jury had to
11:38:00  19 find was that racial animus was a proximate cause.  And we
11:38:05  20 disagreed with that.  But, obviously, the jury found otherwise.
11:38:15  21         But another proximate cause, another likely inability
11:38:16  22 for Mr. Hudak to regulate himself, to manage his anger, to
11:38:16  23 manage his symptoms manifested itself in this offense conduct.
11:38:18  24         One of the things that I thought was interesting was
11:38:20  25 that he did have positive relations with Eva Montoya and her

| | | |
|---|---|---|
| 11:38:23 | 1 | family.  This was a Hispanic family; I think an origin of |
| 11:38:28 | 2 | Honduras.  And what's interesting was that they said we just |
| 11:38:32 | 3 | respected him as a human being, and he respected us as a human |
| 11:38:37 | 4 | being, and we didn't get into his political views.  We didn't |
| 11:38:44 | 5 | get into his messaging, and I think vice-versa.  And in those |
| 11:38:50 | 6 | relationships, and in those interactions with people of |
| 11:38:51 | 7 | different ethnicities, he was able to be constructive and |
| 11:38:54 | 8 | positive. |
| 11:38:55 | 9 | And so, it seems like Mr. Hudak is somebody who needs |
| 11:38:59 | 10 | additional medical treatment for his mental health diagnoses |
| 11:39:01 | 11 | that would help rehabilitate him and eliminate, or at least |
| 11:39:06 | 12 | reduce the Court's concern for recidivism. |
| 11:39:10 | 13 | And, with those things in mind, we would suggest that |
| 11:39:12 | 14 | the Court impose a sentence of no more than 24 months |
| 11:39:19 | 15 | imprisonment. |
| 11:39:20 | 16 | And I want to speak briefly about the guidelines. |
| 11:39:24 | 17 | And I fully respect and understand the Court's ruling with |
| 11:39:28 | 18 | respect to the guideline for obstruction.  And that tends to -- |
| 11:39:33 | 19 | if the Court were not to find obstruction, the difference in |
| 11:39:40 | 20 | the guideline range is 21 to 27 months versus 27 to 33 months. |
| 11:39:53 | 21 | So, the Court could vary down to the 24 months. |
| 11:39:57 | 22 | Or, I would ask the Court to consider this, and this |
| 11:40:00 | 23 | may be somewhat of a unique and different argument.  But under |
| 11:40:06 | 24 | the 3553(a) factors, there was testimony in the trial that |
| 11:40:12 | 25 | Mr. Hudak threatened to kill Justin Smith and had a firearm |

| | | |
|---|---|---|
| 11:40:14 | 1 | with -- in possession. And there were several witnesses |
| 11:40:17 | 2 | presented by the Government that said those things and said |
| 11:40:21 | 3 | that he had a firearm. |
| 11:40:25 | 4 | And the evidence at trial was that he was searched, |
| 11:40:28 | 5 | and that there was no firearm found in his possession after the |
| 11:40:33 | 6 | incident. He denied having a firearm. And, I think, |
| 11:40:37 | 7 | ultimately, the jury was given an interrogatory and asked: Did |
| 11:40:43 | 8 | he possess or threaten with a dangerous weapon, Justin Smith? |
| 11:40:49 | 9 | And the jury said, no. |
| 11:40:51 | 10 | And so, what I would contend is that not that the |
| 11:40:53 | 11 | Government intended to obstruct justice, but potentially, those |
| 11:40:56 | 12 | witnesses committed perjury, that those witnesses were not |
| 11:40:59 | 13 | truthful. And in the sense of an unclean hands-type argument, |
| 11:41:07 | 14 | on the one hand, Mr. Hudak, the defendant, is held to an |
| 11:41:12 | 15 | enhancement for testifying, albeit untruthfully, about certain |
| 11:41:19 | 16 | elements. |
| 11:41:21 | 17 | But, on the other hand, there were certainly |
| 11:41:21 | 18 | untruthful evidence presented by the Government with respect to |
| 11:41:21 | 19 | important elements of the case. Or, we can say that those were |
| 11:41:24 | 20 | not held to a reasonable -- by the standard of -- |
| 11:41:29 | 21 | **THE COURT:** Let me raise this point. Mr. Hudak |
| 11:41:32 | 22 | testified that he never displayed a flag. |
| 11:41:35 | 23 | **MR. LESTER:** Yeah. |
| 11:41:36 | 24 | **THE COURT:** And a probation officer, during the |
| 11:41:36 | 25 | course of a home inspection, took a picture of the flag hanging |

11:41:42  1  on the back of his door.  How are those two things consistent

11:41:45  2  with each other?  That's a rhetorical question.  I don't think

11:41:51  3  they are.

11:42:02  4        Mr. Hudak is not -- the jury did not find that he

11:42:06  5  possessed a firearm.  The jury was charged with making that

11:42:06  6  finding based upon proof beyond a reasonable doubt.

11:42:06  7        **MR. LESTER:**  That's right.

11:42:06  8        **THE COURT:**  And they disagreed.  And no one here has

11:42:17  9  requested an adjustment for the firearm, probably properly so,

11:42:23  10  but I believe the witnesses, that they saw a firearm.

11:42:31  11        So, I think, number one, the witness testimony is

11:42:36  12  entirely different from the testimony Mr. Hudak gave at trial

11:42:38  13  in terms of what's credible and what's not because there are

11:42:42  14  different standards that apply.

11:42:44  15        I say that, kind of -- I agree with the jury.  I

11:42:47  16  think there was some reason to question.  View's not great.

11:42:50  17  But if you look at the circumstantial evidence, the manner in

11:42:56  18  which he acted, the search does not, in any way, in my mind

11:43:00  19  exculpate Mr. Hudak, because it was too limited.  They didn't

11:43:05  20  check the backseat, they didn't check anywhere except

11:43:08  21  immediately in the passenger area, which I think may be enough

11:43:11  22  for reasonable doubt, but I don't think those two things are

11:43:18  23  comparable.

11:43:19  24        Anyway, that's my --

11:43:21  25        **MR. LESTER:**  Understood.  And I don't make that

| | | |
|---|---|---|
| 11:43:23 | 1 | argument in the sense of suggesting the Court's incorrect, or |
| 11:43:28 | 2 | that the findings with respect to obstruction of justice are |
| 11:43:33 | 3 | incorrect, just that there seems to be some difference of |
| 11:43:37 | 4 | opinion amongst the fact-finders as to what happened.  And the |
| 11:43:42 | 5 | perception of Mr. Hudak was only that he was -- perceived a |
| 11:43:57 | 6 | threat.  He perceived a threat on these occasions.  Whether |
| 11:43:57 | 7 | that was a rational threat or an objectively rational threat, I |
| 11:43:57 | 8 | think the jury and I think the Court finds that it wasn't.  We |
| 11:43:57 | 9 | accept that finding. |
| 11:44:03 | 10 | But to the extent that there are -- there were mental |
| 11:44:07 | 11 | issues, mental diagnoses that contributed to his actions, or |
| 11:44:11 | 12 | exacerbated them, or made them more pronounced, we think that's |
| 11:44:13 | 13 | a proximate cause that the Court can consider.  And there are |
| 11:44:18 | 14 | certainly different inferences that the fact-finders can find, |
| 11:44:22 | 15 | but it's not one in which it's clear -- is completely clear to |
| 11:44:27 | 16 | an absolute certainty or to that type of a standard. |
| 11:44:32 | 17 | And, in terms of the publication of the relics, there |
| 11:44:35 | 18 | was no evidence that Mr. Hudak -- that the Nazi flag or the |
| 11:44:43 | 19 | Nazi relics or the cartoon -- racist cartoon paraphernalia |
| 11:44:45 | 20 | ever -- were published outside of his home.  And so, he made |
| 11:44:51 | 21 | those things and kept them in his home. |
| 11:44:53 | 22 | Those were not messaging that he projected outward. |
| 11:44:58 | 23 | Those weren't things that he put out into the community.  And |
| 11:45:03 | 24 | so, we felt that they were highly prejudicial, and I think the |
| 11:45:07 | 25 | Court agreed, but there was some probative value to considering |

| 11:45:11 | 1 | those things. |
| 11:45:12 | 2 | **THE COURT:** After he testified. |
| 11:45:14 | 3 | **MR. LESTER:** And so -- right. And so, you know, with |
| 11:45:15 | 4 | respect to, you know, some of the evidence, there might be |
| 11:45:21 | 5 | some -- some thought that they could be tempered, some of this |
| 11:45:26 | 6 | evidence could be tempered in terms of where we're really going |
| 11:45:37 | 7 | with this is in terms of seriousness of the offense in that he |
| 11:45:37 | 8 | did not -- you know, obviously the Court wants to consider the |
| 11:45:42 | 9 | seriousness of the offense, respect for the law, and a correct |
| 11:45:47 | 10 | punishment. And, when you look at that, perhaps 24 months is |
| 11:45:53 | 11 | sufficient. Twenty-four months is sufficient because the |
| 11:45:56 | 12 | guideline without some of the enhancements would be 21 to 27 |
| 11:45:59 | 13 | months; with it is 27 to 33 months. And some of this evidence |
| 11:46:04 | 14 | and some of the causes for his actions may have been |
| 11:46:07 | 15 | contributed to by a lack of treatment options, and he did not |
| 11:46:14 | 16 | publish into the community some of these relics and some of |
| 11:46:16 | 17 | these, you know, harmful and disgusting things that the Court |
| 11:46:20 | 18 | saw. They were in his house. |
| 11:46:24 | 19 | So, in terms of a sentence -- fashioning a sentence |
| 11:46:28 | 20 | that's, you know, sufficient but not greater than necessary, we |
| 11:46:30 | 21 | think that a sentence of 24 months would be a sufficient |
| 11:46:34 | 22 | deterrent for anybody who would consider acting in this manner. |
| 11:46:39 | 23 | It would be sufficient to protect the public. |
| 11:46:44 | 24 | But what really needs -- and, if you look at offense |
| 11:46:48 | 25 | conduct number one, offense conduct number one carries a |

| | | |
|---|---|---|
| 11:46:53 | 1 | statutory maximum of one year.  Offense two has a higher |
| 11:47:10 | 2 | statutory max, and the guidelines essentially project that. |
| 11:47:17 | 3 | And, also, the guidelines have a multiple-offense |
| 11:47:20 | 4 | calculation which he gets another enhancement for.  So they've |
| 11:47:23 | 5 | considered the fact that there's been more than one offense. |
| 11:47:25 | 6 | And so, if you look at the statutory max for offense number |
| 11:47:25 | 7 | one, essentially, 24 months would be double, double what would |
| 11:47:25 | 8 | be required for offense number one.  And it would be very close |
| 11:47:25 | 9 | to either the low end of the guideline, will be very close to |
| 11:47:25 | 10 | the middle of the guideline, which we argue for, or just |
| 11:47:30 | 11 | slightly below the higher guideline, which is 27 to 33 months |
| 11:47:36 | 12 | that the Court found. |
| 11:47:38 | 13 | So you do address -- we do address deterrence, we do |
| 11:47:41 | 14 | address seriousness of the events with that sentence.  And then |
| 11:47:41 | 15 | we get into the question of rehabilitation.  And I think that |
| 11:47:43 | 16 | there's some evidence here that while Mr. Hudak could be housed |
| 11:47:47 | 17 | at the Bureau of Prisons safely and receive some treatment, it |
| 11:47:51 | 18 | wouldn't be sufficient.  And so what's really important is that |
| 11:47:56 | 19 | Mr. Hudak get the medical type of treatment that he needs to |
| 11:48:00 | 20 | avoid going into this problem again. |
| 11:48:02 | 21 | And, as I said, there were really two periods in |
| 11:48:06 | 22 | Mr. Hudak's life.  One, before 2006 to 2011, before the mental |
| 11:48:13 | 23 | health diagnosis, the car accidents, the disability, where he |
| 11:48:19 | 24 | was law abiding and functioning.  He was married.  He became a |
| 11:48:23 | 25 | citizen.  He worked.  He had two children. |

| | | |
|---|---|---|
| 11:48:28 | 1 | And then there's the period after, where he suffers |
| 11:48:29 | 2 | from these interactions with the community that are negative. |
| 11:48:32 | 3 | And, I think, if he can get the proper treatment in |
| 11:48:35 | 4 | the community, and I don't think that's going to happen in the |
| 11:48:53 | 5 | Bureau of Prisons.  That's why I don't think an extended |
| 11:48:53 | 6 | sentence in the Bureau of Prisons would be appropriate.  He |
| 11:48:56 | 7 | would be more appropriate in a residential setting, where he |
| 11:48:57 | 8 | could get the type of intensive therapy, psychological |
| 11:48:57 | 9 | therapeutic treatment that Dr. Graney described that may have |
| 11:48:57 | 10 | been missing from earlier periods in his -- in his life. |
| 11:49:00 | 11 | In terms of the potential for a fine, you know, I |
| 11:49:04 | 12 | briefed that issue.  And I just simply say that I think his |
| 11:49:10 | 13 | assets, while maybe properly stated in the PSR, might be |
| 11:49:10 | 14 | overstated in his ability to pay a fine, in that he's not an |
| 11:49:16 | 15 | able-bodied person, in that he receives disability payments |
| 11:49:20 | 16 | because of a mental health diagnosis.  He has -- the housing |
| 11:49:26 | 17 | that he has an ownership interest is potentially separate. |
| 11:49:30 | 18 | His wife lives in one of the houses with their minor |
| 11:49:33 | 19 | child who's about seven years old and suffers from autism, and |
| 11:49:37 | 20 | they pay all the expenses for that home.  The other home that |
| 11:49:41 | 21 | he was occupying is now used by his adult daughter.  She pays |
| 11:49:44 | 22 | all the expenses for those homes.  These are people -- there's |
| 11:49:49 | 23 | also a Honda that his older adult daughter is using.  These are |
| 11:49:53 | 24 | assets that are used by people who have no culpability in |
| 11:49:55 | 25 | connection with Mr. Hudak's offenses. |

11:50:00    1          And to consider those assets in terms of fashioning a
11:50:04    2   fine, it might be disproportionate to his ability to pay it,
11:50:08    3   and it might create a hardship on those individuals who ought
11:50:11    4   not be, you know, harmed by his conduct.  There is also --
11:50:14    5          THE COURT:  Well, they can buy them from him.  They
11:50:18    6   can buy them from him.
11:50:19    7          MR. LESTER:  Yeah.  And there's a truck.  And, if you
11:50:21    8   look at the amount that he owes in consumer debt, that far
11:50:27    9   exceeds the amount of money that's in his truck.
11:50:31   10          So, that would be one argument to consider, to not
11:50:34   11   consider a fine.  And then there's the issue of restitution.
11:50:38   12   And, you know, there was a physical confrontation that's
11:50:46   13   captured on video.  Mr. Hudak did not deny the physical
11:50:55   14   confrontation.  He called it wrestling.
11:50:59   15          I think, if that word is -- you know, could be --
11:51:03   16   involve a wide range of things, but it certainly involves
11:51:06   17   physical contact.  So, there was some physical contact with
11:51:09   18   Mr. Duarte.  And, typically, we look at things like, did
11:51:12   19   Mr. Duarte suffer from lost wages?  Did he suffer -- did he
11:51:16   20   seek medical attention?  Did he suffer from a --
11:51:21   21          THE COURT:  Did anybody submit anything on
11:51:24   22   restitution?
11:51:25   23          MS. McFADDEN:  No, Your Honor.
11:51:41   24          THE COURT:  I don't think there's a restitution
11:51:43   25   obligation.

| | | |
|---|---|---|
| 11:51:43 | 1 | **MR. LESTER:**  Okay. |
| 11:51:43 | 2 | **THE COURT:**  Am I wrong? |
| 11:51:43 | 3 | **MS. McFADDEN:**  No, Your Honor. |
| 11:51:43 | 4 | **MR. LESTER:**  Okay.  And so -- and so we would contend |
| 11:51:43 | 5 | that an appropriate sentence, Your Honor, is 24 months with a |
| 11:51:43 | 6 | term of supervised release that provides for intensive mental |
| 11:51:43 | 7 | health treatment that includes psychological treatment, and, |
| 11:51:47 | 8 | you know, and no fine.  That's what we are asking for, Your |
| 11:51:56 | 9 | Honor. |
| 11:51:56 | 10 | **THE COURT:**  All right.  Thank you. I'll have to hear |
| 11:51:58 | 11 | from you at 1:30. |
| 11:52:01 | 12 | Ms. Freeman, Mr. Chamberlin, I'm going to accept the |
| 11:52:03 | 13 | plea agreement in your case.  So, I think we can do the |
| 11:52:07 | 14 | sentencing relatively quickly this afternoon, so I'd say 1:30, |
| 11:52:10 | 15 | and we should be able to finish in 5 or 10 minutes at most. |
| 11:52:15 | 16 | It's a stipulated sentence. |
| 11:52:17 | 17 | So 1:30 for -- we'll deal with Mr. Hamilton at 1:30, |
| 11:52:25 | 18 | and then 5 or 10 minutes, we'll come back and finish this one |
| 11:52:28 | 19 | up.  We'll be in recess until 1:30. |
| 11:52:32 | 20 | (At 11:52 a.m., break taken.) |
| 12:00:59 | 21 | (At 2:00 p.m., proceedings commenced.) |
| 01:59:52 | 22 | (Defendant present.) |
| 01:59:52 | 23 | **THE COURT:**  I guess you probably ought to recall the |
| 01:59:55 | 24 | case since we're back, and then I'll hear from you. |
| 01:59:58 | 25 | **MS. McFADDEN:**  Yes, Your Honor.  We're back on the |

Sentencing - May 1, 2024

02:00:00   1  record with United States versus Marian Hudak.  That's Docket

02:00:03   2  No. 1:23CR231-1.  Mr. Hudak is present along with Mr. Lester on

02:00:09   3  his behalf.  Probation is present, and the interpreter is

02:00:12   4  present as needed.

02:00:13   5          **THE COURT:**  All right.  I'll hear from the

02:00:14   6  Government.

02:00:15   7          **MS. McFADDEN:**  Thank you, Your Honor.

02:00:15   8          Your Honor, we've asked for a variance of 45 months

02:00:17   9  in this case.  And it is because under the 3553(a) factors,

02:00:23  10  there is no sentence less than that that will fully satisfy

02:00:27  11  those needs.  And it is, again, greater but not sufficient

02:00:29  12  [sic] than necessary based on all those factors.

02:00:33  13          When you look at the nature and circumstances of the

02:00:35  14  offense here, there's no way to overstate how serious of an

02:00:39  15  offense this is, because while Mr. Hudak was convicted by a

02:00:42  16  jury of his peers for two hate crimes targeting two different

02:00:46  17  victims, the evidence at trial and the relevant conduct

02:00:51  18  information in the PSR makes it clear that he harassed and

02:00:56  19  menaced many more minorities in the Concord area over a period

02:00:59  20  of years.

02:01:00  21          And there's something uniquely reprehensible about

02:01:04  22  hate crimes because of the dehumanizing effect that they have,

02:01:08  23  the way that they strike fear into communities, the way that

02:01:13  24  they can be so random, how someone could not know at any time

02:01:17  25  if they might be a victim of one simply by virtue, again, of,

| | | |
|---|---|---|
| 02:01:21 | 1 | you know, who they love, the color of their skin, how they |
| 02:01:23 | 2 | worship.  They put entire communities in fear.  And no one |
| 02:01:27 | 3 | should be afraid to do things like take their girlfriend home |
| 02:01:30 | 4 | from their house or drive on a public road. |
| 02:01:34 | 5 | I think Justin Smith, in particular, underscores the |
| 02:01:37 | 6 | randomness of this, because there was no pre-existing |
| 02:01:39 | 7 | relationship between the defendant and Mr. Smith.  And when you |
| 02:01:46 | 8 | look, specifically, at that incident, you have a white man, |
| 02:01:51 | 9 | who's dressed in what appears to be combat gear, driving a |
| 02:01:53 | 10 | truck with a Confederate flag on the back, cutting Mr. Smith |
| 02:01:56 | 11 | off in traffic, calling him the N-word, pounding on his window, |
| 02:02:01 | 12 | and chasing him home in a region of the country where black |
| 02:02:04 | 13 | people were once considered property and where they were |
| 02:02:07 | 14 | lynched and driven out of their homes simply for trying to |
| 02:02:10 | 15 | exercise the constitutional rights that are afforded to |
| 02:02:12 | 16 | everyone in this country.  In Justin's case, it was driving |
| 02:02:16 | 17 | home to his girlfriend and his young son. |
| 02:02:19 | 18 | And the Court has seen the traffic surveillance |
| 02:02:23 | 19 | cameras from that, and the jury saw it, too.  And it's hard, |
| 02:02:29 | 20 | when you see that reckless driving, the way that truck was |
| 02:02:33 | 21 | tailing Justin, and then what happened at the apartment |
| 02:02:37 | 22 | building, not to think of other past incidents that began in |
| 02:02:41 | 23 | this same way. |
| 02:02:42 | 24 | And, again, I want to be clear as I was in an earlier |
| 02:02:48 | 25 | sentencing with the Court today, that when I'm making an |

02:02:50  1    analogy to other events, I'm not suggesting that that's the

02:02:53  2    conduct that's at issue here, and I'm not suggesting that the

02:02:57  3    defendant intended anything related to the conduct in those

02:02:59  4    other cases.

02:03:03  5         But it is very difficult to look at those facts, to

02:03:05  6    see that traffic footage, to hear Justin's testimony here in

02:03:08  7    court and listen to his 911 call, and how afraid he sounded on

02:03:11  8    that call, and not think about Gregory and Travis McMichael,

02:03:13  9    and not think about them in their truck in Georgia, chasing

02:03:16  10   Ahmaud Arbery down a public street where, ultimately, they shot

02:03:19  11   and killed him.  That is the context in which these events took

02:03:24  12   place.

02:03:26  13        And there's no way for Justin to know, as he's

02:03:28  14   calling 911, as he's telling the 911 operator that he's going

02:03:33  15   to get the gun that is in the car, as he calls his girlfriend

02:03:43  16   to have her bring down an assault rifle.  There's no way for

          17   Justin to know how that encounter is going to end.  And there's

02:03:43  18   no way for him to know that he's going to be safe.  There's no

02:03:43  19   way for him to know that this is not going to be the last

02:03:43  20   minutes of his life, that he's never going to see his son

02:03:43  21   again, because some deranged racist in a car was chasing him

02:03:43  22   back to his home --

02:03:45  23             **MR. LESTER:**  Objection, Your Honor.

02:03:45  24             **MS. McFADDEN:**  -- and threatened him there.

02:03:48  25             **THE COURT:**  I'll overrule.  This is argument.

Case 1:23-cr-00231-WO    Document 87    Filed 08/19/24    Page 49 of 82

02:03:50   1          **MS. McFADDEN:**  So, again, I'm not suggesting, again,

02:03:52   2   the conduct is equivalent between these two things, but the

02:03:56   3   parallels are twofold.  And the first is that the same seed of

02:04:00   4   hatred is there, motivating the conduct, the willingness to see

02:04:04   5   someone as an "other," as less than a human, as a category, as

02:04:10   6   an N-word.

02:04:18   7          And the second is, again, as with the threats cases

02:04:18   8   that we deal with, is that the person who is the recipient of

02:04:18   9   it doesn't know what's going to happen.  And that's borne out

02:04:22  10   here again by the 911 call, where Justin literally says, I

02:04:28  11   don't feel safe, in the call.  He was so worried, he felt like

02:04:35  12   his girlfriend needed to bring down a firearm to protect

02:04:39  13   them -- to protect both of them.

02:04:41  14          And I recognize that the Court already addressed this

02:04:43  15   issue, but I just want to be clear that there was no reason for

02:04:49  16   those witnesses who said they saw the defendant with a gun to

02:04:55  17   lie about that.  That was their recollection in the heat of the

02:04:55  18   moment, where things were very chaotic and very frightening,

02:04:58  19   and that was their recollection when they came into court.

02:05:04  20          And so, whether or not the jury made a finding

02:05:06  21   related to that, they testified as to their recollection of

02:05:07  22   events how they experienced it and the combination of factors,

02:05:09  23   including the thought that someone had a firearm, and had

02:05:13  24   called Justin an N-word, and that was the entire encounter that

02:05:18  25   they knew going into it it had to have been incredibly

02:05:20  1  frightening.  And that's an experience that Justin had that not

02:05:20  2  many of us have to experience.

02:05:22  3         So, for that, and as well as the continued course of

02:05:25  4  conduct related to the Duartes, the insults directed at them

02:05:32  5  based on their nationality, the children -- the Duartes'

02:05:36  6  children who heard those and who were victims of those, it's an

02:05:42  7  incredibly serious crime, and it deserves a serious sentence to

02:05:43  8  answer for that.

02:05:47  9         In terms of the defendant's history and

02:05:48  10  characteristics, what's alarming in looking at the PSR is that

02:05:52  11  despite the fact that there was a dearth of criminal

02:05:54  12  convictions and encounters in law enforcement until 2020, it

02:05:57  13  does show a larger pattern of escalation.  The longest stretch

02:06:01  14  of time between the 2020 period and the federal arrest in this

02:06:03  15  case that he went without committing a crime, being arrested,

02:06:05  16  or receiving judgment was just over seven months.  That

02:06:10  17  occurred between March and October of 2020.  That's paragraph

02:06:14  18  49 of the PSR.

02:06:16  19         On multiple occasions, he had charges pending when he

02:06:17  20  committed new criminal conduct.  And, again, that's reflected

02:06:20  21  in paragraphs 50 to 55 of the PSR.

02:06:24  22         Now, the Court has read Dr. Graney's report and heard

02:06:28  23  her testimony today, and we don't contest any aspect of that.

02:06:33  24  But to argue that that presents a mitigator, I think, rests on

02:06:38  25  a couple of false premises.  The first of which is that these

02:06:42  1  mental health conditions had any sort of causal nexus with the

02:06:47  2  offense conduct here.  In fact, she specifically stated in

02:06:50  3  court today that that was not the opinion that she had made

02:06:55  4  regarding this.

02:06:57  5         And, second, she didn't have access in making the

02:06:59  6  opinions -- or the opinions that she did have, obviously, to

02:07:01  7  the evidence at trial, the Government's file, the testimony of

02:07:02  8  the witnesses.  And she even noted herself that treatment

02:07:03  9  options for these types of issues are very dependent on a

02:07:06  10  patient being forthright with their health care provider about

02:07:10  11  what is actually going on, what the conduct is.  And the record

02:07:15  12  reflects that that's not the case here.

02:07:19  13         There are many, many, many, many people in this

02:07:23  14  country who suffer from these same types of mental health

02:07:25  15  conditions, obsessive-compulsive disorder, generalized anxiety

02:07:30  16  disorder, and that does not make them behave in this way.  They

02:07:34  17  are not driving their truck around town and calling random

02:07:37  18  motorists N-words.  So to establish some sort of causal link or

02:07:42  19  excuse the behavior based on that is, quite frankly, offensive

02:07:46  20  to the many people who have had these conditions and managed

02:07:46  21  not to behave in a menacing or violent or threatening way.

02:07:51  22         In terms of the Bureau of Prisons' ability to handle

02:07:55  23  these issues, I think Dr. Graney was clear that they do have

02:07:59  24  that capacity, and I recall her testimony being even that the

02:08:02  25  defendant might even do better in the Bureau of Prisons than

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | out of the Bureau of Prisons.  And I think that that's borne       |
| 02:08:09 | 2  | out by the facts in the PSR, which are that there has been         |
| 02:08:09 | 3  | treatment in the past, there has been dealing with these issues    |
| 02:08:09 | 4  | in the past, and yet, this conduct did not stop, and if only --    |
| 02:08:09 | 5  | if anything, it was escalating.                                    |
| 02:08:12 | 6  | In terms of specific deterrence, the variant sentence              |
| 02:08:17 | 7  | is necessary here as well.  The fact that this conduct             |
| 02:08:26 | 8  | continued over a number of years, setting aside the general        |
| 02:08:29 | 9  | abhorrent nature of it, is confounding when you look at it in      |
| 02:08:30 | 10 | light of the fact that what caused these issues, apparently, in    |
| 02:08:32 | 11 | terms of the mental health and the disability problems were        |
| 02:08:34 | 12 | these three different traffic accidents.  They're documented in    |
| 02:08:40 | 13 | paragraph 79 of PSR.  There's accidents in 2006, 2007, and         |
| 02:08:47 | 14 | 2011, causing persistent back and neck pain.                       |
| 02:08:50 | 15 | So, the fact that the response to that is, then, to                |
|          | 16 | get into these roadway altercations with random motorists is       |
|          | 17 | perplexing.  I mean, in the incident with Javier Cruz,             |
| 02:08:59 | 18 | Mr. Cruz, in fact, rear-ended Mr. Hudak's truck when he was        |
| 02:09:03 | 19 | brake-checking him when they had that entire incident and          |
|          | 20 | altercation.                                                       |
| 02:09:07 | 21 | So to continue the behavior after these obvious                    |
| 02:09:07 | 22 | negative consequences that preceded it is baffling and             |
| 02:09:07 | 23 | indicates that there needs to be a measure of specific             |
| 02:09:10 | 24 | deterrence.  For instance, you know, the assault on Justin         |
| 02:09:15 | 25 | Smith happened after Javier Cruz had rear ended him.  So he        |

02:09:21   1   gets into that, you know, roadway incident after he's already

02:09:23   2   had the negative consequences of an earlier one.

02:09:27   3           And the incident with Jechelle Hall, where he was

02:09:30   4   yelling racial slurs at her, happened after the incidents with

02:09:32   5   both Mr. Duarte and Mr. Smith, two different incidents where

02:09:36   6   two different victims had to pull firearms on him to bring an

02:09:44   7   end to the conflict.  And still there was no deterrence based

02:09:47   8   on that.  The behaviors are still the same.

02:09:47   9           And even if you credit the testimony at trial that

02:09:47   10  these two incidents related primarily to bright headlights in

02:09:47   11  one instance and a revving engine on the other, the fact that

02:09:50   12  those very minor issues could create such a violent response is

02:09:54   13  also incredibly concerning when you're looking at specific

02:09:58   14  deterrence.

02:09:59   15          Finally, in terms of general deterrence, again, the

02:10:03   16  variant sentence is critical here because this is not one

02:10:08   17  instance.  It's not one threat.  It's a course of conduct over

02:10:14   18  a number of years involving multiple victims, two of which were

02:10:17   19  ones that were presented at trial where a jury convicted.

02:10:19   20          And in my position paper, I've detailed a whole lot

02:10:25   21  of statistics that the FBI has gathered over the years related

02:10:28   22  to hate crimes.  But one thing they make clear is that the

02:10:32   23  pattern is on the rise.  This is an escalating problem in this

02:10:36   24  country, and it is one that, again, is completely rending the

02:10:44   25  fabric of society where we cannot look at one another as human

02:10:47  1  beings but instead are motivated to categorize one another

02:10:47  2  based on membership in these various protected classes and that

02:10:47  3  someone is deserving of violence based on that membership.

02:10:51  4          There is a general deterrence need to impose a

02:10:53  5  variant sentence in this case for that reason.

02:10:57  6          **THE COURT:**  I'm going to ask you a hard question --

02:11:01  7          **MS. McFADDEN:**  Um-hum.

02:11:01  8          **THE COURT:**  -- but you brought up the increasing

02:11:06  9  tendency to categorize people based on their race, and we see

02:11:09 10  that action appearing to be legitimized in some very different

02:11:17 11  contexts.  I mean, just to be candid, when you read doctrine

02:11:27 12  from various things that says white people are oppressors.

02:11:34 13  Maybe historically -- not maybe historically -- historically I

02:11:55 14  get the issues, but I don't -- I don't see white people as

02:11:57 15  oppressors.  There -- there's a variety of things like that.

02:12:02 16          But if we continue down this track of taking these

02:12:05 17  positions of characterizing people based on a physical -- on a

02:12:09 18  characteristic like race, like religion, like other things, you

02:12:14 19  know -- I mean, I won't go into what I agree and disagree with.

02:12:21 20  You can probably gather that from my comments here today, but

02:12:24 21  you encourage other people to do the same.  If it's okay for

02:12:28 22  some to characterize white people as oppressors, then that's

02:12:32 23  going to encourage some people to characterize other groups as

02:12:36 24  various things because it seems okay to characterize based on

02:12:41 25  race.

02:12:43  1      And from my perspective -- and we all see this all

02:12:47  2  the time -- there are -- there is such a thing as collateral

02:12:54  3  consequences.  Not everybody has got the same degree of

02:12:59  4  intelligence.  Not everybody has got the same ability to sort

02:13:04  5  through, you know, what has merit and what doesn't.  And I

02:13:10  6  don't -- I'm -- that's a -- that's a concern of mine, that if

02:13:16  7  you start down that road, even if well-intentioned, others will

02:13:24  8  be encouraged to go down that road.  It's one of the things I

02:13:27  9  think about in this case.

02:13:28  10      There's no excuse, none, for what Mr. Hudak did,

02:13:34  11  but -- and I'm not -- I'm not offering this as a justification

02:13:37  12  or an explanation.  I'm just observing that if it's wrong to

02:13:42  13  characterize based on race, it's wrong across the board,

02:13:46  14  period.  It's not good for anybody.  Maybe -- you can say

02:13:51  15  whatever you'd like in response to that.

02:13:54  16      **MS. McFADDEN:**  I don't disagree with the Court's

02:13:55  17  proposition that it is wrong to categorize based on race.  I

02:13:59  18  think one of the things that's present in this particular case

02:14:08  19  is the historical context of categorizing Mr. Smith based on

02:14:15  20  race in light of what that has meant in this country for --

02:14:21  21  since its origins, essentially.

02:14:24  22      **THE COURT:**  I'm going to take some issue.  I mean,

02:14:27  23  I'm 63, almost 64, so I was born in 1960 as Jim Crow and

02:14:37  24  related things were kind of coming to a close.  We were getting

02:14:40  25  to the '70s, which were weird as all get out for everybody, I

| | | |
|---|---|---|
| 02:14:45 | 1 | think.  And then we started moving into the '80s, and I'm not |
| 02:14:49 | 2 | saying that, you know, people who had been victimized by Jim |
| 02:14:55 | 3 | Crow should have gotten over it in 20 years, not in any way, |
| 02:14:59 | 4 | shape, form, or fashion.  But my life experience has been that, |
| 02:15:03 | 5 | yes, those bad things happened; yes, they were wrong, and I |
| 02:15:08 | 6 | agree with all that 100 percent. |
| 02:15:10 | 7 |          But when people were kind of left alone, things |
| 02:15:18 | 8 | started trending in the right -- a better direction.  And so |
| 02:15:21 | 9 | two of the comments that you've made, hate crimes are on the |
| 02:15:24 | 10 | rise, and categorizing people based on race, certainly are very |
| 02:15:35 | 11 | thought-provoking, and I really agree with most of what you |
| 02:15:39 | 12 | said.  But you have to ask the question of why?  What's going |
| 02:15:45 | 13 | on to cause that increase that we're seeing in the hate crimes |
| 02:15:51 | 14 | that are being committed? |
| 02:15:56 | 15 |          And I don't -- and I don't know the answer to that, |
| 02:16:04 | 16 | but until -- at some point we all get past trying to classify |
| 02:16:10 | 17 | people based on race and move I'd say backwards to the '80s, |
| 02:16:16 | 18 | frankly, or the '90s -- maybe I'm wrong -- but at least my |
| 02:16:20 | 19 | experience in the south, having seen some real live vicious |
| 02:16:34 | 20 | hateful KKK members and other things growing up, that ugly face |
| 02:16:38 | 21 | of racism seemed to be diminishing, and now it's coming back. |
| 02:16:42 | 22 | And I think there -- I'll just leave it with I think there are |
| 02:16:45 | 23 | a lot of reasons that it's coming back and I'm really troubled. |
| 02:16:53 | 24 | None of that excuses what Mr. Hudak did. |
| 02:16:58 | 25 |          **MS. McFADDEN:**  I understand.  I understand the Court. |

02:17:03   1   I think -- just in terms of the rising number of hate crimes, I

02:17:04   2   do think that regardless of what the reasons are that if we do

02:17:08   3   believe that general deterrence has an effect, and Congress

02:17:13   4   tells us it's one of the 3553(a) factors, that that's a

02:17:18   5   relevant fact when considering what sentence is --

02:17:24   6          THE COURT:   Certainly in terms of the seriousness of

02:17:25   7   the offense.  Like we say with heroin or opioids, if use is

02:17:30   8   going up, that increases the seriousness of the offense.  Same

02:17:33   9   is true with hate crimes.  If they're going up, then that

02:17:38  10   certainly needs to be considered.

02:17:41  11          MS. McFADDEN:   Your Honor, I'll speak briefly to the

02:17:42  12   issue of the fine.  I think that, you know, the Court is

02:17:48  13   correct.  It's not really whether the assets are available in

02:17:51  14   terms of the Court's decision whether or not to impose one, and

02:17:51  15   my position paper does discuss this so I won't belabor it.

02:17:55  16          But the language of the guidelines is not that the

02:17:59  17   Court may impose a fine, it's that the Court shall.  And quite

02:18:03  18   often in a very large percentage of our cases in this district,

02:18:09  19   the fine is often waived for inability to pay, but those

02:18:16  20   defendants don't have the assets that are reflected in the PSR

02:18:19  21   here.

02:18:20  22          I've calculated, based on the PSR's numbers, as to

          23   what the cost of confinement and supervision costs and lay that

          24   out in my position paper, and that's why we've made the request

02:18:23  25   that we have in terms of the fine in this case.

02:18:25  1        **THE COURT:**  I don't find the request unreasonable.  I

02:18:27  2   certainly understand your reasoning on that.

02:18:30  3        **MS. McFADDEN:**  Your Honor, based on the factors as

02:18:31  4   outlined in my position paper, and as I went over just now, the

02:18:35  5   guidelines I just don't think properly account for the most

02:18:40  6   critical aspects of this case.  That's why we've asked for a

02:18:44  7   variant sentence.  We think it is the least amount of time that

02:18:47  8   is appropriate, based largely on the nature and the

02:18:51  9   circumstances of the offense, the repeated course of conduct,

02:18:53  10  the pattern of escalation, the effect on the community, the

02:19:00  11  need to protect the public and specific deterrence.  So we'd

02:19:03  12  ask the Court to impose that sentence.

02:19:05  13       **THE COURT:**  All right.  Mr. Hudak, you're not

02:19:07  14  required to say anything.  If you choose to remain silent, your

02:19:07  15  silence will not be held against you in any way whatsoever, but

02:19:07  16  you do have the right to address the Court before any sentence

02:19:07  17  is imposed, and if you wish to address the Court, now is the

02:19:07  18  appropriate time.

02:19:21  19       **MR. LESTER:**  He does not wish to address the Court.

02:19:24  20       **THE COURT:**  All right.  Well, the nature and

02:19:45  21  circumstances of the offense have been addressed very

02:19:47  22  extensively by both sides.  I don't think there's -- I don't

02:20:02  23  think there's any way to overstate the malice, the fear, the

02:20:09  24  cruelty of a personal and physical attack on someone because of

02:20:16  25  the color of their skin, their country of origin, or religion,

| | | |
|---|---|---|
| 02:20:25 | 1 | any of those things.  That -- with or without the history |
| 02:20:33 | 2 | that -- from the southern United States, that is alarming and |
| 02:20:42 | 3 | concerning and a very serious offense. |
| 02:20:47 | 4 | I think -- let me see if I can put this together. |
| 02:21:31 | 5 | One of the things -- pieces of this case that I'd say I think I |
| 02:21:42 | 6 | actually found to be even more alarming than the Justin |
| 02:21:49 | 7 | Smith -- Justin Smith -- Smith or Duarte encounter was the -- |
| 02:21:59 | 8 | who was BL?  I can't remember her name, the woman driving home. |
| 02:22:04 | 9 | **MS. McFADDEN:**  Ilia Valencia? |
| 02:22:06 | 10 | **THE COURT:**  No, the woman driving. |
| 02:22:09 | 11 | **MS. McFADDEN:**  Oh, Bobbi Loftin. |
| 02:22:13 | 12 | **THE COURT:**  Ms. Loftin, a soft-spoken -- I mean, |
| 02:22:29 | 13 | seemed to be a very solid human being, talked about her |
| 02:22:29 | 14 | encounter, calling her husband, wasn't sure what was going to |
| 02:22:29 | 15 | happen, wanted somebody on the phone in case things escalated |
| 02:22:29 | 16 | with Mr. Hudak, drove a different route home in case Hudak |
| 02:22:45 | 17 | followed her. |
| 02:22:45 | 18 | To describe the events as found by the jury as |
| 02:22:55 | 19 | disturbing is an understatement, and I think having to go off |
| 02:22:55 | 20 | my recollection of Mr. Hudak's testimony -- let me see if I can |
| 02:23:05 | 21 | find it.  This is one example of the testimony on direct |
| 02:23:28 | 22 | examination.  I'm proud to be an American, so proud I became a |
| 02:23:33 | 23 | citizen in 2006.  I think Mr. Hudak said that several times. |
| 02:23:47 | 24 | When you see the facts of this case, you can't help |
| 02:23:50 | 25 | but think what does Mr. Hudak think it is to be an American? |

| | | |
|---|---|---|
| 02:23:58 | 1 | What is he so proud of?  And what I think most Americans are |
| 02:24:02 | 2 | proud of is our constitution, our recognition of the rights of |
| 02:24:10 | 3 | a lot of different people.  And I think most Americans are |
| 02:24:15 | 4 | proud of the manner in which this country, while not having |
| 02:24:27 | 5 | been perfect for its entire history, has, I think, better than |
| 02:24:32 | 6 | any place in the world, learned to deal with different |
| 02:24:37 | 7 | cultures, different societies, all living under one nation.  It |
| 02:24:43 | 8 | hasn't been an easy process, but it's a process that, at least |
| 02:24:50 | 9 | from my perspective, merits a significant amount of pride. |
| 02:24:57 | 10 | To be an American is to not only have certain rights, |
| 02:25:03 | 11 | it is to respect the rights of others to exercise their same |
| 02:25:08 | 12 | rights, even if I disagree with what those others may believe, |
| 02:25:13 | 13 | with what those others may stand for.  That's the beauty of |
| 02:25:18 | 14 | America.  That's what makes me proud to be an American, because |
| 02:25:24 | 15 | that's what I see my fellow citizens do day-in and day-out, |
| 02:25:28 | 16 | respect the rights of others and celebrate the exercise of |
| 02:25:36 | 17 | their rights. |
| 02:25:39 | 18 | And it's not rights for some.  It's not rights for |
| 02:25:43 | 19 | the black people who are my friends and agree with me about |
| 02:25:50 | 20 | Trump.  It's not celebrate the rights of a woman from Honduras |
| 02:25:57 | 21 | because she is accepting of me.  It is respecting the rights of |
| 02:26:06 | 22 | Ms. Loftin or Mr. Duarte or Mr. Smith to drive on the highway, |
| 02:26:17 | 23 | to live in a house, to have different political views, to -- |
| 02:26:21 | 24 | that's what America is. |
| 02:26:31 | 25 | And to see someone in a case like this in terms of -- |

02:26:34  1  I'm speaking now in terms of the seriousness of the offense and

02:26:38  2  the history and -- and to some degree the history and

02:26:40  3  characteristics of the defendant.  To see someone do things

02:26:43  4  like celebrate the Third Reich; to see someone do thing like

02:26:54  5  celebrate the -- apparently celebrate the segregation that the

02:26:59  6  Confederate flag, at least to some, represents; to see someone

02:27:08  7  be willing and prepared to interfere with the rights of another

02:27:13  8  to drive on a street or to live in the house by name calling

02:27:23  9  and using the N-word, driving in manner so as to terrify those

02:27:27  10  individuals, engaging in confrontations in an effort to

02:27:33  11  diminish their lives simply because of the color of their skin

02:27:40  12  or their country of origin diminishes everything that this

02:27:46  13  country really is all about.

02:27:53  14          And so in that sense, I have two offenses here.  One

02:27:57  15  of them is a misdemeanor -- it's kind of startling to me that

02:28:02  16  it's a misdemeanor, but it is a misdemeanor -- and then one of

02:28:06  17  them is a felony for which a statutory maximum of 10 years

02:28:13  18  applies.  There's no question -- let me back up a second.

02:28:24  19          When I talk about celebrating the Third Reich or the

02:28:33  20  Confederacy, that's a tricky area because we do have freedom of

02:28:38  21  speech here.  No matter how much I may despise the speech of a

02:28:43  22  nationalist, the speech of a KKK person, or anyone else, there

02:28:48  23  is a certain right.  There is certain discomfort.  There's a

02:28:52  24  certain difficulty that comes in living in a country that

02:28:57  25  recognizes the exercise -- recognizes and protects the exercise

02:29:02  1    of free speech, but there is a line.  And when that

02:29:08  2    disagreement crosses the line into force, violence, and

02:29:10  3    intimidation of others for those reasons, it is unlawful, and

02:29:15  4    it is a very serious offense.

02:29:17  5         In terms of the history and characteristics of

02:29:21  6    Mr. Hudak, there -- I agree with the defendant to some degree.

02:29:25  7    There is a little bit of reason to be concerned about mental

02:29:31  8    health history because these are -- these appear to be

02:29:39  9    genuinely diagnosed mental health conditions of Mr. Hudak, and

02:29:49  10   they are issues that he will likely have to address for the

02:29:49  11   rest of his life.

02:29:51  12        But the Government makes a fair point, and to say

02:29:56  13   that those conditions excuse treatment of individuals violently

02:30:10  14   and with intimidation because of those mental health conditions

02:30:13  15   is not right, is not persuasive.  On the other hand, for a

02:30:17  16   traffic situation or some other situation to escalate, for

02:30:24  17   example, when the car accident occurred, and that escalated

02:30:29  18   into ultimately racial name calling -- and I'm talking about

02:30:34  19   the brake-checking incident, that type of thing -- that's --

02:30:37  20   that's an illustration of a temper tantrum.

02:30:41  21        It doesn't excuse the use of racial slurs in

02:30:44  22   addressing that, but that's the kind of thing that -- where I

02:30:53  23   can see those mental health conditions might have contributed

02:30:56  24   to Mr. Hudak losing his temper and control under those

02:31:04  25   particular circumstances.  It doesn't excuse it, but certainly

Case 1:23-cr-00231-WO    Document 87    Filed 08/19/24    Page 63 of 82

| | | |
|---|---|---|
| 02:31:16 | 1 | may be a contributing factor. |
| 02:31:19 | 2 | But the Smith -- the Justin Smith episode is very |
| 02:31:22 | 3 | different from that. I found Mr. Smith's testimony very |
| 02:31:26 | 4 | credible in terms of -- as did the jury with respect to what |
| 02:31:31 | 5 | occurred obviously, and that is he's just driving down the |
| 02:31:37 | 6 | road, Mr. Hudak pulls up, and Mr. Smith didn't do anything to |
| 02:31:43 | 7 | aggravate the situation, and all of a sudden Mr. Hudak is |
| 02:31:55 | 8 | engaging with Mr. Smith in the manner in which he did, |
| 02:31:58 | 9 | following him into the apartment complex, blocking the drive of |
| 02:32:04 | 10 | the apartment complex, and continuing to yell slurs and |
| 02:32:09 | 11 | obscenities at Mr. Smith. |
| 02:32:12 | 12 | I don't see that -- I don't find an argument that the |
| 02:32:15 | 13 | mental health conditions may have been a proximate cause of |
| 02:32:17 | 14 | that behavior compelling, and I recognize with that -- or I |
| 02:32:22 | 15 | should say that's in light of the fact that Mr. Hudak had more |
| 02:32:27 | 16 | than enough time to talk to any of these mental health |
| 02:32:31 | 17 | providers about the issues that he was having. And for |
| 02:32:35 | 18 | whatever reason, Mr. Hudak didn't feel that it rose to a level |
| 02:32:41 | 19 | where it merited any type of discussion other than he was |
| 02:32:43 | 20 | having a disagreement with his neighbor over politics. Calling |
| 02:32:54 | 21 | somebody names because they're from Mexico is not a |
| 02:33:00 | 22 | disagreement about politics. |
| 02:33:01 | 23 | So what sentence is appropriate here? I think -- |
| 02:33:04 | 24 | well, I'm going to start with the proposition of I -- depending |
| 02:33:10 | 25 | on how the factors are weighed, I think I could justify a |

02:33:14  1   sentence anywhere between zero and that 11-year mark, because

02:33:20  2   these types of criminal offenses tear at the very fabric of our

02:33:25  3   society.

02:33:26  4          I am troubled, very troubled as my comments to

02:33:29  5   Ms. McFadden indicated, that we live in a time where some

02:33:37  6   apparently find it appropriate to categorize certain groups of

02:33:42  7   people a certain way by the color of their skin, arguably

02:33:51  8   perhaps for good reasons, but that type of activity in my mind

02:33:55  9   is difficult -- or I'm going to say wrong across the board

02:34:06 10   because it emboldens other people to make other

02:34:08 11   characterizations that they think are as well founded as one --

02:34:09 12   the other group's characterization of people based on race, and

02:34:12 13   that's just problematic for everybody.

02:34:18 14          It's problematic for that great majority who live in

02:34:21 15   the middle who don't characterize people based on race, but

02:34:24 16   instead make every effort to get to see the content of their

02:34:31 17   character and judge people on things other than their race or

02:34:36 18   their national origin and celebrate those differences that

02:34:40 19   merit celebration.

02:34:42 20          I'm rambling, I know, and I'm going off track a

02:34:46 21   little bit, but I'm trying to find some way to illustrate how

02:34:52 22   far removed Mr. Hudak's testimony is -- I mean actions were in

02:35:02 23   comparison to what people who are genuinely trying to do well

02:35:02 24   in society are doing.

02:35:04 25          So here I think that, even if it was not violative of

02:35:12   1   the law, the continued willingness to intimidate others based

02:35:16   2   on race, the continued willingness to engage in this conduct,

02:35:22   3   and the level of threatened violence and violence associated

02:35:27   4   with the conduct is extraordinarily troubling.

02:35:37   5            I think the Government makes some very good arguments

02:35:39   6   for an upward variance to 45 months.  I think there are good

02:35:46   7   arguments that the variance could be higher than that.

02:35:51   8            I think -- let me deal with the defendant's argument

02:35:54   9   first.  I don't find anything unreasonable about the

02:35:58   10  defendant's argument that the Court should vary downward to 24

02:36:05   11  months because there are reasons to be concerned about

02:36:07   12  Mr. Hudak's mental state, about his mental health treatment.

02:36:12   13  I'm not confident at this point that Mr. Hudak's going to seek

02:36:17   14  or, let's say, genuinely engage in mental health treatment

02:36:20   15  because I think in the past he has -- it looks like he's

02:36:24   16  engaged in that treatment when he feels like it's beneficial to

02:36:26   17  him to help him with the issues that he's having, but not in a

02:36:33   18  manner that would be beneficial to others and perhaps

02:36:35   19  countenance a strategy by Mr. Hudak to quit acting on these

02:36:42   20  racial grounds in his life.

02:36:44   21           And so I'm hopeful that Mr. Hudak will take advantage

02:36:47   22  of mental health treatment, but at this point in time I'm not

02:36:50   23  quite prepared to say -- or find that mental health counseling

02:36:54   24  and treatment is something that will likely reduce the risk of

02:37:01   25  Mr. Hudak's conduct in the future.  So I weigh the factors

| | | |
|---|---|---|
| 02:37:07 | 1 | differently from the parties. |
| 02:37:08 | 2 | I think there's more -- much more going on here than |
| 02:37:14 | 3 | I would characterize as covered by the guideline calculation |
| 02:37:20 | 4 | here, which -- what was it, a six and a six? Let's see, ten |
| 02:37:28 | 5 | plus three plus two for the obstruction was a 15, and then the |
| 02:37:35 | 6 | multiple counts adjustment kicked in, so it ended up being a |
| 02:37:38 | 7 | 17. |
| 02:37:41 | 8 | The multiple counts adjustment I think is |
| 02:37:44 | 9 | appropriately applied. The obstruction of justice is |
| 02:37:49 | 10 | appropriately applied. It was the victim-related adjustment. |
| 02:37:55 | 11 | If the Court at sentencing determines beyond a reasonable doubt |
| 02:38:06 | 12 | that the defendant intentionally selected any victim or |
| 02:38:06 | 13 | property -- or any property as the object because of the actual |
| 02:38:10 | 14 | or perceived race, color, religion, national origin and gender, |
| 02:38:13 | 15 | that plus three, even though the statute -- I just -- I don't |
| 02:38:18 | 16 | think that plus three fully covers the gravity of what occurred |
| 02:38:25 | 17 | here. |
| 02:38:25 | 18 | It's one thing to select someone based on race. It's |
| 02:38:28 | 19 | another thing to attack them verbally and physically while at |
| 02:38:35 | 20 | the same time uttering -- expressing the racial animosity |
| 02:38:46 | 21 | underlying the reason for the attack. These are -- these are |
| 02:38:48 | 22 | very concerning attacks. |
| 02:38:53 | 23 | Let's take a five-minute recess. |
| 02:38:56 | 24 | (At 2:39 p.m., break taken.) |
| 02:46:59 | 25 | (At 2:47 p.m., break concluded.) |

| | | |
|---|---|---|
| 02:48:25 | 1 | **THE COURT:** I guess to explain the sentence in kind |
| 02:48:27 | 2 | of a granular way, in my mind, if you look at it this way, as |
| 02:48:35 | 3 | to Count One, the base offense level is a 10. As to Count Two, |
| 02:48:42 | 4 | the base offense level is a 10. Both -- both of the counts |
| 02:48:52 | 5 | received a plus three for selection of the victim based on |
| 02:49:00 | 6 | race, and both counts received a plus two for obstruction, |
| 02:49:04 | 7 | resulting in an offense level of 15 for Counts One and Two. |
| 02:49:10 | 8 | And, on the one hand, I think -- in the absence of an |
| 02:49:15 | 9 | application of a firearm as to Count One, I think that you can |
| 02:49:21 | 10 | make an argument that that calculation adequately addresses |
| 02:49:36 | 11 | both offenses. But in my mind, the two offenses, while |
| 02:49:44 | 12 | arguably equal in culpability in terms of the defendant's |
| 02:49:47 | 13 | intentions, in terms of his actions of threats, of threats of |
| 02:49:56 | 14 | violence, and so on and so forth, maybe they are equal. |
| 02:50:05 | 15 | But for the November 26 episode, the defendant |
| 02:50:09 | 16 | attacked in this verbal sense his neighbor Mr. Duarte, and then |
| 02:50:15 | 17 | they had the confrontation resulting in a struggle in which was |
| 02:50:20 | 18 | an additional physical contact over and above the threats and |
| 02:50:26 | 19 | other things. |
| 02:50:28 | 20 | And so at a granular level, I don't think the 10 -- |
| 02:50:35 | 21 | the count -- 10 levels for Count One as a starting point is |
| 02:50:40 | 22 | sufficient because I think there was a physical assault |
| 02:50:40 | 23 | involved there in addition to the threats. So by my -- in |
| 02:50:44 | 24 | terms of fashioning a sentence here, in determining whether or |
| 02:50:47 | 25 | not to vary upward or not, I think to fully reflect the 35 -- |

02:50:54  1  all of the 3553(a) factors, but particularly the seriousness of
02:51:00  2  the offense, the need to protect -- or, yeah, the need -- the
02:51:06  3  need for specific and general deterrence and providing just
02:51:12  4  punishment, I think some recognition needs to be taken for --
02:51:21  5  some recognition needs to be given to the fact that that one
02:51:24  6  escalated past verbal threats and intimidation to an actual
02:51:30  7  physical wrestling confrontation in which at various points
02:51:36  8  seemed to be directed to both Mr. Duarte and his girlfriend at
02:51:40  9  that time.
02:51:42  10         So if I were -- in terms of talking about a variance,
02:51:46  11  I think plus two, which would result in a 17 instead of a 15,
02:51:54  12  so you'd have 17, and that would bump to a 19 after applying
02:51:59  13  the multi-count rules, so that results in a little bit higher
02:52:03  14  guideline calculation of -- a 19 and a two is 33 to 41 months.
02:52:18  15  That's not quite the sentence the Government has requested, but
02:52:21  16  I think the 41 -- the 41 months should be imposed a little
02:52:29  17  differently from the manner in which it would usually be
02:52:33  18  imposed, which would be one year on Count One and then 41
02:52:36  19  months on Count Two to run concurrent with each other.
02:52:40  20         I don't think there ought to be -- in terms of the
02:52:45  21  sentence that is actually imposed, I don't think concurrent is
02:52:49  22  appropriate here.  I think two separate offenses in which an
02:52:55  23  individual is deprived the use of rights, federal rights, that
02:53:07  24  that ought to be recognized separately.
02:53:10  25         So the sentence that I would impose would be 29

02:53:14  1   months on Count Two and 12 months consecutive on Count One for

02:53:19  2   a total of 41 months.

02:53:25  3         I think a fine is appropriate here.  I think the

02:53:29  4   Government's argument for $50,000 is appropriate or 100 --

02:53:35  5   50,000 per count, I can't -- wasn't it 50,000 total?

02:53:38  6         **MS. McFADDEN:**  It was 50,000 per count, Your Honor.

02:53:40  7         **THE COURT:**  Per count, 50,000 per count is

02:53:43  8   appropriate, but I'm a little bit -- I'm troubled for different

02:53:49  9   reasons on imposing a large fine.

02:53:51  10        I would hate to impose a fine that Mr. Hudak simply

02:53:56  11  walked away from by waiving any claim he has to the property

02:54:01  12  and letting his wife take everything.  I'm not sure how the

02:54:05  13  wife would work that out.  I think Mr. Hudak ought to have to

02:54:11  14  pay this fine, and I also think Mr. Hudak needs to do something

02:54:15  15  to -- for his community.

02:54:17  16        If he can ride around in his community and threaten

02:54:22  17  people in the community, he needs to be in his community and do

02:54:24  18  something positive, because I think compelling Mr. Hudak to do

02:54:30  19  something positive with all manner of people by way of

02:54:51  20  volunteer community service has some potential, number one, to

02:54:55  21  deter in a very different strange sense, and that is to deter

02:55:04  22  by allowing Mr. Hudak to serve and interact with others on a

02:55:04  23  positive basis rather than interacting with others on a

02:55:04  24  negative basis.

02:55:13  25        And Mr. Hudak certainly can fight that and continue

| | | |
|---|---|---|
| 02:55:15 | 1 | to believe in these things, but he'll be on supervision, and I |
| 02:55:20 | 2 | have ways to address that while he's on supervision, so I'm -- |
| 02:55:33 | 3 | in terms of the fine, I think $100,000 total, that gives me |
| 02:55:39 | 4 | some concern, even with the level of assets. So I think a fine |
| 02:55:41 | 5 | of 10,000 as to each count, for a total of 20, plus I think |
| 02:55:45 | 6 | Mr. Hudak ought to have to do 40 hours of community service |
| 02:55:47 | 7 | during each month of his term of supervised release, which will |
| 02:55:48 | 8 | be three years. |
| 02:55:51 | 9 | So 41 months divided the way that I have described, |
| 02:55:54 | 10 | $10,000 fine on each count, community service, 40 hours per |
| 02:55:58 | 11 | month, and I apologize for this. Today has just turned into a |
| 02:56:03 | 12 | disaster day for me. I have a 3:00 Teams meeting I have to |
| 02:56:08 | 13 | attend. I have to be there for half an hour. |
| 02:56:13 | 14 | Has anybody got a problem waiting until 3:30 before I |
| 02:56:16 | 15 | impose this sentence? |
| 02:56:19 | 16 | **MR. LESTER:** No, Your Honor. |
| 02:56:19 | 17 | **THE COURT:** All right. We're going to be in recess |
| 02:56:22 | 18 | until 3:30. You've heard my outline of the sentence. If you |
| 02:56:28 | 19 | want to be heard further when I come back, you can. We'll be |
| 02:56:34 | 20 | in recess. |
| 02:56:35 | 21 | (At 2:56 p.m., break taken.) |
| 03:28:42 | 22 | (At 3:28 p.m., break concluded.) |
| 03:28:42 | 23 | **THE COURT:** All right. So one of the arguments that |
| 03:28:46 | 24 | was made by the defendant that I -- is not frivolous certainly, |
| 03:28:52 | 25 | and I haven't fully addressed or explained why that should |

| | | |
|---|---|---|
| 03:28:58 | 1 | result in a different sentence, it's the combination of age |
| 03:29:02 | 2 | plus criminal history category II, and there are two things |
| 03:29:07 | 3 | about that. |
| 03:29:09 | 4 | Mr. Hudak is 52 years old, and there are a lot of |
| 03:29:17 | 5 | positive things in his history that arguably mitigate, and as |
| 03:29:26 | 6 | the defendant argued pretty clean -- apparently a pretty clean |
| 03:29:32 | 7 | lifestyle up until the last 10 years when these mental health |
| 03:29:37 | 8 | issues have arisen and for which Mr. Hudak has received |
| 03:29:43 | 9 | treatment. |
| 03:29:44 | 10 | But, number one, as the Government argues, there |
| 03:29:48 | 11 | seems to be something of an escalation in the conduct for some |
| 03:29:54 | 12 | reason.  The prior convictions that are described are 2020 an |
| 03:30:13 | 13 | open burning when prohibited, which sounds like he set a fire |
| 03:30:17 | 14 | in his front yard or something.  Then there's a misdemeanor DWI |
| 03:30:21 | 15 | and misdemeanor carrying a concealed weapon, horn and warning |
| 03:30:26 | 16 | device, use of red or blue light, misdemeanor simple assault, |
| 03:30:36 | 17 | in paragraph 53 a misdemeanor disorderly conduct, misdemeanor |
| 03:30:43 | 18 | criminal contempt and misdemeanor stalking.  So there's a whole |
| 03:30:46 | 19 | series of misdemeanor offenses there that have now escalated |
| 03:31:02 | 20 | over the past three years or so into this very serious felony |
| 03:31:02 | 21 | conduct.  That's a concern, and I think to some degree offsets |
| 03:31:02 | 22 | the mitigation that age might otherwise suggest. |
| 03:31:06 | 23 | And, number two, the -- in most cases, consistent |
| 03:31:11 | 24 | with the FBI crime statistics, we'll say, criminal activity |
| 03:31:14 | 25 | seems to go down the older individuals get, and by the time -- |

| | | |
|---|---|---|
| 03:31:19 | 1 | there's a substantial drop when an individual reaches their |
| 03:31:25 | 2 | 50's. Mr. Hudak doesn't seem to follow that trend, number one. |
| 03:31:32 | 3 | But, number two, there are some things that could be perhaps |
| 03:31:38 | 4 | excused, but by youth and immaturity -- particularly immaturity |
| 03:31:45 | 5 | in terms of race relationships. |
| 03:31:49 | 6 | When an individual who's reached 52 years old should |
| 03:31:53 | 7 | certainly be held to a standard that requires that individual, |
| 03:31:59 | 8 | even if they hold beliefs that others may find abhorrent, that |
| 03:32:09 | 9 | individual should really have sufficient maturity not to act on |
| 03:32:15 | 10 | those beliefs in a way in the manner in which Mr. Hudak did in |
| 03:32:19 | 11 | this particular case. |
| 03:32:21 | 12 | So this is -- it's a little different -- in my mind |
| 03:32:23 | 13 | this case presents a little different analysis in terms of age |
| 03:32:30 | 14 | from the standard cases given the elevating nature of the |
| 03:32:34 | 15 | conduct in terms of seriousness and also in looking at it from |
| 03:32:38 | 16 | the standpoint that at 52 years old Mr. Hudak's involvement in |
| 03:32:49 | 17 | this very serious conduct reflecting, I guess I would add, to |
| 03:32:54 | 18 | some very concerning beliefs about the appropriateness of |
| 03:32:57 | 19 | attacking people based on national origin or race or those -- |
| 03:33:04 | 20 | anything else in that category is very concerning. We -- I'll |
| 03:33:10 | 21 | leave it at that. |
| 03:33:14 | 22 | I think for the most part I've addressed all of the |
| 03:33:18 | 23 | Government's arguments, but there were a lot of them in this |
| 03:33:20 | 24 | pleading. I agree with the Government in terms of the |
| 03:33:49 | 25 | seriousness the offense, the far reaching consequences of |

03:33:52  1   hate crimes and the escalation of a defendant's criminal

03:33:58  2   history.

03:34:00  3        I think my position with respect to the mental health

03:34:06  4   may be slightly different.  The variance up to 41 months I

03:34:10  5   think is sufficient in this case because I do think, although a

03:34:16  6   very small part, I do think it's -- the mental health issues

03:34:24  7   contributed to some degree in things like controlling his

03:34:27  8   temper and that kind of thing, but they don't explain attacking

03:34:31  9   people on the basis of their race.

03:34:36 10        Anything I failed to address or need to address?

03:34:39 11        **MS. McFADDEN:**  No, Your Honor.

03:34:40 12        **THE COURT:**  Mr. Lester?

03:34:48 13        **MR. LESTER:**  No, Your Honor.  I do feel compelled to

03:34:50 14   speak to something that the Government raised the Court's been

03:34:54 15   addressing, and I don't think I've been able to speak or spoken

03:34:57 16   since then.  I'll just say that, you know, the issues of this

03:35:03 17   country with respect to slavery and discrimination, you know,

03:35:06 18   those aren't unique to this country.  Those happen in other

03:35:11 19   civilizations and other places.  But what's unique about this

03:35:15 20   country is that it has been progressive enough as a society and

03:35:19 21   as a people to change those things.

03:35:22 22        And so I would simply ask that whatever sentence you

03:35:25 23   fashion for Mr. Hudak that it allow him to make the changes

03:35:32 24   that are necessary to improve himself so that he doesn't find

03:35:36 25   himself in this situation again.

| | | |
|---|---|---|
| 03:35:43 | 1 | **THE COURT:** Well, I recognize and agree with much of |
| 03:35:45 | 2 | what you say, and the sentence I fashioned I think gives him |
| 03:35:48 | 3 | that opportunity, but the choice will be his in the end. If I |
| 03:35:53 | 4 | didn't think that because of our society and because of our |
| 03:35:59 | 5 | laws and because of the way things work that there wasn't a -- |
| 03:36:03 | 6 | that Mr. Hudak didn't have a chance to change some of the |
| 03:36:06 | 7 | views -- again, views are one thing. Acting in a manner -- |
| 03:36:19 | 8 | acting on those views in a manner that violates the law and |
| 03:36:22 | 9 | here deprives people of their federal -- the exercise of their |
| 03:36:23 | 10 | federal rights is a completely different thing from simply |
| 03:36:27 | 11 | viewpoint. I hope that what I fashion here will be of |
| 03:36:33 | 12 | sufficient deterrence to compel Mr. Hudak to investigate his |
| 03:36:40 | 13 | internal views and make changes at least with respect to his |
| 03:36:41 | 14 | actions as a result of those views. |
| 03:36:44 | 15 | Mr. Hudak, if you will stand, please, sir. In |
| 03:36:47 | 16 | Case No. 1:23CR231-1, United States versus Marian Hudak, as to |
| 03:36:59 | 17 | Count One, it is hereby ordered that the defendant is committed |
| 03:37:01 | 18 | to the custody of the Bureau of Prisons for a term of 12 months |
| 03:37:05 | 19 | followed by one year of supervised release. I don't think I |
| 03:37:09 | 20 | can impose a 10,000 -- can I impose 10,000 on the misdemeanor? |
| 03:37:14 | 21 | What's the maximum? I may have to do it all on Count Two. |
| 03:37:19 | 22 | You can have a seat for a second, Mr. Hudak. |
| 03:37:24 | 23 | **MS. McFADDEN:** Your Honor, I believe the max is |
| 03:37:25 | 24 | $25,000 for a misdemeanor, but I can confirm. |
| 03:37:32 | 25 | **THE COURT:** Oh, the presentence report says 100 on |

| | | |
|---|---|---|
| 03:37:34 | 1 | Count One and 250 on Count Two. |
| 03:37:36 | 2 | **MS. McFADDEN:**  Then I'm wrong; I trust the PSR. |
| 03:37:38 | 3 | **THE COURT:**  All right.  I'll go forward with it that |
| 03:37:40 | 4 | way.  So backing up, as to Count One, it is hereby ordered that |
| 03:37:47 | 5 | the defendant is committed to the custody of the Bureau of |
| 03:37:48 | 6 | Prisons for a term of 12 months followed by one year of |
| 03:37:52 | 7 | supervised release.  A special assessment of $100 is mandatory |
| 03:37:55 | 8 | and is hereby imposed.  A fine in the amount of $10,000 is |
| 03:38:00 | 9 | imposed, and restitution is not imposed in this case. |
| 03:38:04 | 10 | With respect to Count Two, it is ordered that the |
| 03:38:06 | 11 | defendant is committed to the custody of the Bureau of Prisons |
| 03:38:08 | 12 | for a term of 29 months.  That sentence is imposed to run |
| 03:38:12 | 13 | consecutively to the sentence imposed as to Count One followed |
| 03:38:16 | 14 | by three years of supervised release.  A fine in the amount of |
| 03:38:20 | 15 | $10,000 is imposed as to Count Two for a total amount of fines |
| 03:38:25 | 16 | of $20,000. |
| 03:38:29 | 17 | During the period of supervised release, it is |
| 03:38:31 | 18 | ordered that the defendant shall abide by the mandatory |
| 03:38:35 | 19 | conditions of supervised release.  The Court imposes the |
| 03:38:39 | 20 | standard conditions of supervised release as listed in the |
| 03:38:42 | 21 | presentence report finding that those standard conditions are |
| 03:38:46 | 22 | necessary to permit the Probation Office to conduct effective |
| 03:38:49 | 23 | supervision. |
| 03:38:51 | 24 | And, finally, the following special conditions are |
| 03:38:54 | 25 | imposed for the reasons set forth in the justification |

Case 1:23-cr-00231-WO    Document 87    Filed 08/19/24    Page 76 of 82

| | | |
|---|---|---|
| 03:38:56 | 1 | following each condition: |
| 03:39:00 | 2 | One: The defendant shall cooperatively participate |
| 03:39:03 | 3 | in a mental health treatment program, which may include |
| 03:39:03 | 4 | inpatient treatment, and pay for those treatment services as |
| 03:39:03 | 5 | directed by the probation officer. |
| 03:39:08 | 6 | Two: The defendant shall abstain from the use of |
| 03:39:10 | 7 | alcoholic beverages, shall not associate with individuals |
| 03:39:10 | 8 | consuming alcoholic beverages, and shall not use any medication |
| 03:39:10 | 9 | containing alcohol without the permission of the probation |
| 03:39:10 | 10 | officer or a prescription from a licensed physician. The |
| 03:39:10 | 11 | defendant shall submit to any form of alcohol testing as |
| 03:39:10 | 12 | directed by the probation officer. |
| 03:39:32 | 13 | Three: The defendant shall not associate with or be |
| 03:39:42 | 14 | in the company of any white supremacist group gang member or |
| 03:39:44 | 15 | security threat group member. The defendant shall not frequent |
| 03:39:47 | 16 | any locations where gangs or security threat groups congregate |
| 03:39:49 | 17 | or meet. The defendant shall not wear, display, use, or |
| 03:39:53 | 18 | possess any clothing or accessories which have any gang or |
| 03:39:56 | 19 | security threat group significance. |
| 03:39:58 | 20 | Four: The defendant shall not have any contact other |
| 03:40:01 | 21 | than incidental contact in a public forum, such as ordering in |
| 03:40:05 | 22 | a restaurant, grocery shopping, et cetera, with any of the |
| 03:40:05 | 23 | victims of the instant offense conduct specifically -- I think |
| 03:40:07 | 24 | I need to say their name -- Justin Duarte and Justin -- were |
| 03:40:15 | 25 | they both Justin? |

03:40:17  1       **MS. McFADDEN:**  Yes, Your Honor --

03:40:19  2       **THE COURT:**  Justin Duarte and Justin Smith.  A

03:40:25  3  contact addressed in this condition includes, but is not

03:40:26  4  limited to, direct, indirect, personal, telephonic, written or

          5  through a third party.  If the defendant has any contact with

03:40:33  6  any victim, the defendant is required to immediately remove

03:40:33  7  himself from the situation and notify the probation office

03:40:35  8  within 24 hours.

03:40:36  9       Five:  The defendant shall submit his person,

03:40:36 10  residence, office, vehicle or any property under his control to

03:40:36 11  a warrantless search.  Such search shall be conducted by a

03:40:37 12  United States probation officer at a reasonable time, and in a

03:40:37 13  reasonable manner, based upon reasonable suspicion of

03:41:08 14  contraband or evidence of a violation of a condition of

03:41:08 15  release.  Failure to submit to such a search may be grounds for

03:41:08 16  revocation.  The defendant shall warn any residents that his

03:41:08 17  premises may be subject to searches.

03:41:11 18       And, finally, the defendant shall perform 20 hours of

03:41:11 19  community service work during the term of supervised release --

03:41:15 20  excuse me -- shall perform 20 hours per month of community

03:41:19 21  service work during the term of supervised release.  I think I

03:41:24 22  imposed -- I can't remember what I said.  Isn't it 36 months?

03:41:31 23       **MS. McFADDEN:**  Your Honor, the term of supervised

03:41:32 24  release is 36 months.  My notes indicate you had originally

03:41:35 25  directed that 40 hours per month be --

| | | |
|---|---|---|
| 03:41:38 | 1 | **THE COURT:** Forty hours for how many months? |
| 03:41:41 | 2 | **MS. McFADDEN:** You had said for the term of |
| 03:41:43 | 3 | supervised release. |
| 03:41:44 | 4 | **THE COURT:** Yeah, Joe, do you mind checking on that? |
| 03:41:44 | 5 | (Reporter checks the record.) |
| 03:42:05 | 6 | **THE COURT:** The defendant shall perform 40 hours of |
| 03:42:07 | 7 | community service work during each month of the term of |
| 03:42:10 | 8 | supervised release as directed by the probation officer. The |
| 03:42:14 | 9 | defendant shall pay any community service fee required as |
| 03:42:18 | 10 | directed by the probation officer. |
| 03:42:24 | 11 | Mr. Hudak, you do have the right to appeal the |
| 03:42:24 | 12 | sentence that I have imposed. If you choose to appeal, notice |
| 03:42:24 | 13 | of appeal must be filed within 14 days of the entry of |
| 03:42:24 | 14 | judgment. If you wish to appeal and cannot afford the services |
| 03:42:24 | 15 | of counsel, counsel will be appointed to represent you. |
| 03:42:24 | 16 | Mr. Lester will be responsible for advising you with respect to |
| 03:42:24 | 17 | your right to appeal and will file a notice of appeal if you |
| 03:42:24 | 18 | instruct him to do so. |
| 03:42:46 | 19 | I saw you nodding your head. I assume that means you |
| 03:42:50 | 20 | want him to file your notice of appeal, or you're just nodding |
| 03:42:54 | 21 | that you understand? |
| 03:42:55 | 22 | **MR. LESTER:** We've discussed that, Your Honor, and I |
| 03:42:57 | 23 | do expect that that's his choice. |
| 03:42:59 | 24 | **THE COURT:** It's fine either way. It's his choice. |
| 03:43:01 | 25 | I just wanted to make sure what the nod was. |

| | | |
|---|---|---|
| 03:43:04 | 1 | Anything further, Mr. Lester? |
| 03:43:06 | 2 | **THE DEFENDANT:** Your Honor, please, can I have one |
| 03:43:08 | 3 | question? |
| 03:43:08 | 4 | **THE COURT:** Hold on a second. |
| 03:43:12 | 5 | The Court does make the following recommendations to |
| 03:43:14 | 6 | the Bureau of Prisons, that the defendant be designated to a |
| 03:43:17 | 7 | facility where he may receive mental health counseling and |
| 03:43:22 | 8 | treatment consistent with the treatment described in the |
| 03:43:30 | 9 | presentence report. |
| 03:43:40 | 10 | **MR. LESTER:** We don't have any questions, Your Honor. |
| 03:43:42 | 11 | **THE COURT:** All right. |
| 03:43:42 | 12 | **MR. LESTER:** That was acknowledgement that we had |
| 03:43:45 | 13 | discussed that issue. |
| 03:43:47 | 14 | **THE COURT:** Understood. |
| 03:43:48 | 15 | **MR. LESTER:** Yeah. |
| 03:43:49 | 16 | **THE COURT:** Understood. All right. Let's see. |
| 03:43:52 | 17 | Yes, sir? |
| 03:43:53 | 18 | **PROBATION OFFICER:** Yes, Your Honor. Regarding the |
| 03:43:55 | 19 | special assessment, I just wanted a clarification. |
| 03:43:56 | 20 | **THE COURT:** Oh, I said $100 on Count One. It's not |
| 03:43:59 | 21 | 100. |
| 03:44:00 | 22 | **PROBATION OFFICER:** It would be $25 on Count One; 100 |
| 03:44:02 | 23 | on Count Two. |
| 03:44:03 | 24 | **THE COURT:** Yep, sorry. Count One special assessment |
| 03:44:06 | 25 | was my error, $25 not $100. Thank you. |

Sentencing - May 1, 2024

03:44:13   1              All right.  Is the last case in custody?

03:44:16   2    Mr. Dusenbury?  We'll take a five-minute recess.

03:44:19   3              (At 3:44 p.m., proceedings concluded.)

           4

           5

           6

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

Sentencing - May 1, 2024

```
 1                        * * * * *

 2                   C E R T I F I C A T E

 3        I certify that the foregoing is a correct transcript
          from the record of proceedings in the above-entitled
 4        matter.

 5

 6
                         Joseph B. Armstrong
 7                   Joseph B. Armstrong, FCRR
                     United States Court Reporter
 8                   324 W. Market Street
                     Greensboro, NC  27401
 9
                     Date: 08/16/2024
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sentencing - May 1, 2024